**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| VINCENZO S. PRATTICO JR., JUSTINN CHARLES MANUEL WATERS, JARON REESE WEIMER, KRISTINN RENEE ROBEDA WATERS, MICHAEL PHILIP PRYSTALOSKI, *individually and on behalf of all others similarly situated,* | ) Case No.: ) ) ) ) ) ) **CLASS AND COLLECTIVE** ) **ACTION COMPLAINT** |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DAVEY RESOURCE GROUP, INC. and THE DAVEY TREE EXPERT COMPANY, | ) JURY TRIAL DEMANDED ) ) |
| Defendants. | ) |

Plaintiffs, Vincenzo S. Prattico Jr., Justinn Charles Manuel Waters, Jaron Reese Weimer, Kristinn Renee Robeda Waters and Michael Prystaloski ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, allege upon personal knowledge as to themselves and upon information and belief as to other matters (which is based on, among other things, their experiences at Defendants' work facilities, review of Defendants' records, conversations with Defendants' hourly employees and investigation of Plaintiffs' counsel), as follows:

**PRELIMINARY STATEMENT**

1.     This case exposes a company that built its business on the backs of a mobile, traveling workforce. Workers were dispatched across multiple states, housed in employer-directed hotels, and required to drive for hours, maintain company vehicles, attend mandatory meetings, and complete rounds of preparatory and concluding work each day. Rather than pay those workers for the work it demanded, Defendants, Davey Resource Group, Inc. ("DRG") and The Davey Tree

1

Expert Company ("Davey Tree" and collectively with DRG, "Defendants") quietly redefined "work" to mean only the narrow window of output it chose to count. DRG substituted a quota-based "productive hours" metric for the honest accounting of time that federal and state wage law demands, leaving drive time, safety meetings, vehicle maintenance, and hours of required daily labor off the clock and off the paycheck.

2.     Plaintiffs bring this action on behalf of themselves and all similarly situated current and former GPS Field Technicians, Lead Technicians, Coordinators, Project Managers, Utility Auditors, and other members of DRG's traveling workforce employed by Defendants during the period three (3) years from date of filing to the present. They seek to recover unpaid overtime wages, liquidated damages, and all other relief to which they are entitled under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and under the Ohio Minimum Fair Wage Standards Act, R.C. §§ 4111.01 *et seq.* ("OMFWSA"), which they assert as parallel claims on behalf of a Rule 23 class. The OMFWSA independently requires overtime compensation at one-and-one-half times an employee's regular rate for all hours worked in excess of forty per workweek, R.C. § 4111.03(A), and vests employees with a private right of action to recover unpaid wages and an additional equal amount as liquidated damages for violations of its provisions. R.C. § 4111.10(A). The right to overtime compensation is further secured by Article II, Section 34a of the Ohio Constitution, which establishes a floor of wage protections that no employer operating in Ohio may lawfully deny. Certain Representative Plaintiffs additionally assert individual claims for unlawful retaliation under 29 U.S.C. § 215(a)(3) of the FLSA and R.C. § 4111.13(B) of the OMFWSA, arising from their termination for accurately recording compensable work time; those claims are set forth in Counts II and IV below and do not alter the common questions of law and fact that make this action appropriate for collective and class treatment.

3.     Defendants are part of the Davey enterprise, a company tracing its origins to 1880 that holds itself out as one of the largest employee-owned corporations in North America. Within that enterprise, DRG and Davey Tree operate as a distinct business line, established in 1995, that provides utilities and related clients with a range of specialized field services across multiple practice units, including Asset Management Consulting, Vegetation Management Consulting, Communications Construction Services, Environmental Consulting Services, Surveying & Civil Engineering Services, and Comprehensive Mitigation Solutions. This action arises from Defendants' operations in Joint Use, GIS/Data Collection, Mobile Resource Equipment, Utility Access Management, where Defendants deliver utility-facing services (joint-use pole management, GIS inventory and verification, field data collection, audits and inspections, vegetation work planning, and fiber and line-construction support) across geographically dispersed territories spanning the continental United States.

4.     The nature of that work made a traveling field workforce indispensable. Defendants dispatched their GPS Field Technicians, Coordinators, Utility Auditors, and other similarly situated employees, from assignment to assignment across wide geographic areas, lodged them in employer-directed hotels and accommodations, required them to operate company-assigned vehicles to reach remote jobsites, and expected them to arrive each day with the tools, equipment, and data systems necessary to complete their assignments. The Representative Plaintiffs and the workers they seek to represent were the backbone of that operation. They did not work at a fixed location where they could report at a set time, leave at day's end, and be paid for the hours in between. They worked wherever Defendants sent them — in states far from their homes, on projects that changed with each new utility contract, against production quotas that varied by client, terrain, and assignment. Every working day began at a hotel with tasks Defendants required

3

and ended at a hotel with tasks Defendants required. Every task performed by each Plaintiff during their workday was done using a Defendant-assigned vehicle, at Defendants' direction, for Defendants' benefit.

5.    Defendants' failure to pay for all of that time was not accidental, and it was not the product of a rogue supervisor or an isolated payroll miscalculation. It was policy, written, distributed by management, and applied uniformly to every field worker subject to the productive hours system. In a formal hours-calculation guide, Defendants stated that pay would be based on "productive hours" derived from poles completed against a preset production rate or, where the required rate was not met, from the period between an employee's first and last audited pole of the day. The same guide expressly categorized drive time and other "non-productive" activities as excluded from compensable-hour calculations. Defendants thereby reduced the legally recognized workday to a curated window of billable output, stripping out hours of required work that preceded, followed, and regularly interrupted that window.

6.    Management directives reinforced these exclusions at every level. Written rules distributed as reminders of "standard practices" tied bonus eligibility to minimum productive-hour thresholds of 40 and 45 hours per week; excluded non-productive time and PTO from those thresholds; instructed that employees would not be paid drive time to vehicle-maintenance appointments; capped any payable maintenance time at one-half hour regardless of how long the work actually took; and required employees to clock out entirely if a maintenance appointment ran longer. These were not casual understandings or informal customs. They were written directives, issued from above, enforced as ongoing conditions of continued field employment, and applied uniformly to every technician subject to the productive hours system across every project and every state in which Defendants deployed its field workforce.

4

7. The daily experiences of the Representative Plaintiffs illustrate what those policies meant in practice. Before driving to a jobsite from their lodging each morning and after returning each evening, Plaintiffs were required to perform a range of tasks, essential to Defendants' operations, including: resolving overnight quality-control data flags, downloading and updating GIS maps, planning the day's field route, conducting mandatory vehicle walk-around inspections, loading tools and equipment, uploading field photographs, syncing ArcGIS and other data platforms, completing daily inspection logs and reports, securing equipment, and refueling company vehicles. They attended mandatory weekly safety, OSHA, and toolbox meetings. They maintained the company vehicles that were their only means of reaching assignments Defendants selected. And they drove to and from their assigned jobsites, between thirty minutes and an hour each way, every day, on every project. Under Defendants' productive hours system, none of this time counted. None of it was paid.

8. These practices violate the FLSA. The statute requires overtime compensation at one-and-one-half times the regular rate for all hours worked in excess of forty per workweek. 29 U.S.C. § 207(a). The Portal-to-Portal Act does not immunize the conduct at issue: once an employee's principal activities have commenced, all time through the completion of the last principal activity, including travel between locations, mandatory meetings, required preparatory and concluding tasks, and employer-required waiting time, must be counted as hours worked. *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005); 29 C.F.R. §§ 785.24–785.26. Similarly, travel from a required reporting place to the worksite is compensable as hours worked. 29 C.F.R. § 785.38. Overnight travel that cuts across an employee's normal working hours is compensable. 29 C.F.R. § 785.39. Attendance at employer-required meetings is compensable. 29 C.F.R. § 785.27. Waiting time that cannot be effectively used for personal purposes is compensable. 29 C.F.R. §§ 785.15–785.17.

Defendants' productive hours system excluded every one of these categories from the hours on which overtime was calculated and paid.

9. The FLSA does not permit an employer to relabel compensable work as "non-productive" and exempt it from overtime obligations. It does not permit an employer to cap required maintenance time at thirty minutes when the actual work routinely takes several hours. It does not permit an employer to exclude from overtime calculations the daily drive time, pre-departure work, post-return tasks, and mandatory meetings that are integral and indispensable to the principal activities for which field technicians are employed. The law looks to the work employees were required to perform, not to the label Defendants chose to put on it.

10. This case is well suited for representative treatment. The FLSA expressly authorizes collective actions on behalf of similarly situated employees, 29 U.S.C. § 216(b), and Rule 23 class treatment is appropriate for the parallel state-law wage claims. The threshold liability questions are overwhelmingly common across the proposed collective and class: whether Defendants maintained the written productive hours policy described above; whether that policy systematically excluded compensable travel, meeting, maintenance, and preparatory time from pay calculations; whether Defendants own records (payroll data, productivity logs, GPS data, project procedure manuals, and management communications) are sufficient to identify affected workers and quantify underpayments; and whether the same written and unwritten rules injured all field technicians in the same basic way across Defendants' various divisions. Those questions do not turn on any individual plaintiff's particular circumstances. They turn on Defendants' uniform policies, and, upon information and belief, Defendants applied the same policies to all its traveling workforce across its various divisions.

11. The Representative Plaintiffs' claims are typical of the class and collective they seek

to represent. They performed the same core work as absent class and collective members, traveled under the same operating model, drove the same company-assigned vehicles loaded with company tools and equipment, were evaluated under the same productive hours metrics, attended the same mandatory meetings, maintained the same employer-assigned vehicles under the same thirty-minute pay cap, and were denied compensation under the same written and unwritten rules. Defendants deploy a traveling field workforce across multiple operational divisions including, upon information and belief, Utility Asset Management, Joint-Use/Pole Inspection, GIS/Data Collection, Mobile Resource Equipment, Asset Management Consulting, and other divisions requiring sustained remote deployment.

12.     The Representative Plaintiffs' own assignments span at least twelve states across the Northeast, Mid-Atlantic, Southeast, Midwest, and New England regions, reflecting a workforce that is national in geographic scope. Upon information and belief, the proposed FLSA Collective and Rule 23 Class together encompass well in excess of one hundred (100) current and former field employees who were subject to Defendants' productive hours system at any point during the three (3) years preceding the filing of this Complaint, and who performed work in states throughout the continental United States under the same compensation framework described herein. Because the common liability questions are susceptible to collective and class-wide proof, and because the value of many individual claims is modest relative to the cost of independent litigation, joinder of all affected workers is impracticable and representative treatment is unambiguously the superior means of adjudicating these claims.

13.     Defendants' violations were willful. The productive hours methodology was not an ambiguous administrative practice subject to reasonable interpretation. It was a written system that expressly identified drive time and other compensable categories as excluded from paid hours,

7

applied by managers who communicated and enforced its terms verbally across multiple states and projects, and implemented through payroll systems that consistently recorded less time than workers actually worked. The depth of Defendants' awareness is confirmed by its own conduct: when certain Representative Plaintiffs accurately recorded compensable drive time in their reported hours, as the law required, and as DRG was obligated to pay, DRG did not respond by examining its pay practices. It terminated those employees and accused them of falsifying records and stealing time including Plaintiffs Vincenzo Prattico and Kristinn Waters. An employer that discharges workers for correctly recording work time that is compensable under 29 C.F.R. § 785.38 and binding Supreme Court authority cannot claim it acted in good faith or with reasonable grounds to believe its pay practices were lawful. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). That response , termination in place of compliance, is the clearest possible evidence that Defendants knew its productive hours system excluded compensable time and willfully chose enforcement over correction. The three-year FLSA limitations period applies in full. 29 U.S.C. § 255(a).

14. Plaintiffs accordingly seek unpaid overtime compensation under 29 U.S.C. § 207(a) and R.C. § 4111.03(A), including overtime compensation owed because Defendants failed to count compensable pre-departure work, drive time, post-shift data work, mandatory meetings, vehicle-maintenance time, weather-delay waiting time, and other required work when calculating Plaintiffs' and similarly situated employees' hours worked; liquidated damages under 29 U.S.C. § 216(b) and R.C. § 4111.10; for the individually named terminated Representative Plaintiffs, reinstatement or, in the alternative, front pay in lieu of reinstatement, together with back pay and compensatory damages, under 29 U.S.C. § 215(a)(3) and R.C. § 4111.13(B) including for Plaintiffs Vincenzo Prattico Jr., Justinn Waters and Kristinn Waters; injunctive relief under 29 U.S.C. § 217

8

restraining Defendants from continuing to apply their unlawful productive-hours system and from retaliating against any worker for asserting rights protected under the FLSA or applicable state wage law; prejudgment interest where available; attorneys' fees and costs under 29 U.S.C. § 216(b) and R.C. § 4111.10; and all other relief to which Plaintiffs, the FLSA Collective, and the Rule 23 Class are entitled.[1]

## JURISDICTION AND VENUE

15.     This Court has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, a law of the United States. This Court has specific jurisdiction over the FLSA collective action claims pursuant to 29 U.S.C. § 216(b).

16.     This Court has original jurisdiction over all claims in this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). This is a proposed class action in which: (a) the proposed class consists of not fewer than 100 members; (b) at least some members of the proposed class are citizens of states different from the state of citizenship of Defendants; and (c) the claims of the proposed class members exceed $5,000,000.00 in the aggregate, exclusive of interest and costs, based on the number of affected workers, the duration of the violations, and the volume of compensable time systematically excluded from pay under DRG's productive hours system during the applicable limitations periods.

---

[1] Plaintiffs do not presently assert standalone minimum-wage or "gap time" claims under 29 U.S.C. § 206(a), R.C. § 4111.02, or Article II, Section 34a of the Ohio Constitution. Plaintiffs' wage claims are presently pleaded as overtime claims under 29 U.S.C. § 207(a) and R.C. § 4111.03(A), based on Defendants' failure to count compensable pre-departure work, drive time, post-shift data work, mandatory meetings, vehicle-maintenance time, weather-delay waiting time, and related work when determining overtime-qualifying hours and calculating overtime compensation. Plaintiffs reserve the right to seek leave to amend to assert minimum-wage claims if Defendants' payroll, timekeeping, productivity, GPS, project, or other records show workweeks in which total wages paid divided by total compensable hours worked fell below the applicable federal or Ohio minimum wage.

17.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims arising under the Ohio Minimum Fair Wage Standards Act, R.C. §§ 4111.01 *et seq.* ("OMFWSA"), and over the individual retaliation claims asserted under 29 U.S.C. § 215(a)(3), R.C. § 4111.13(B), and Ohio common law, because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

18.     Venue is proper in the Northern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants maintain their principal place of business within this judicial district; a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this judicial district; and Defendants' unlawful compensation policies were adopted, administered, and enforced from within this district and applied to field workers dispatched from and managed out of operations located here.

### THE PARTIES

**Plaintiffs**

19.     Plaintiff Vincenzo S. Prattico, Jr. ("Prattico") is an adult individual currently residing in New Eagle, Pennsylvania. Prattico was employed by Defendants as a GPS Field Technician within DRG's Utility Asset Management division since October 21, 2022 through approximately April 26, 2026. At all relevant times of his employment, Prattico has been paid an hourly rate of $23.00, has been classified by Defendants as a non-exempt employee eligible for overtime compensation under the FLSA and applicable state law, and has been subject to the productive hours and quota-based compensation system described herein. Prattico consents in writing to be a party plaintiff in this FLSA collective action pursuant to 29 U.S.C. § 216(b), a copy of which consent is attached hereto as Exhibit A. Prattico brings this action on behalf of himself

and all similarly situated current and former employees of Defendants during the applicable limitations period.

20.     Plaintiff Justinn Charles Manuel Waters ("J. Waters") is an adult individual residing in Dover, Delaware. J. Waters was employed by Defendants, first as a Utility Auditor and then as a Coordinator, within DRG's Joint Use, GIS/Data Collection, Make Ready Engineering ("MRE"), and Utility Asset Management divisions from approximately September 2023 through April 2026. At all relevant times, J. Waters was paid an hourly rate of $21.50, was classified by Defendants as a non-exempt employee eligible for overtime compensation under the FLSA and applicable state law and was subject to the productive hours and quota-based compensation system described herein. J. Waters consents in writing to be a party plaintiff in this FLSA collective action pursuant to 29 U.S.C. § 216(b), a copy of which consent is attached hereto as Exhibit B. J. Waters brings this action on behalf of himself and all similarly situated current and former employees of Defendants during the applicable limitations period.

21.     Plaintiff Jaron Reese Weimer ("Weimer") is an adult individual residing in Ridgeley, West Virginia. Weimer was employed by Defendants as a GPS Field Technician 1 within DRG's Utility Access Management division, performing joint-use audits, pole inspections, and GIS data collection, from approximately December 18, 2022 through August 22, 2025. At all relevant times, Weimer was paid an hourly rate of $22, was classified by Defendants as a non-exempt employee eligible for overtime compensation under the FLSA and applicable state law and was subject to the productive hours and quota-based compensation system described herein. Weimer consents in writing to be a party plaintiff in this FLSA collective action pursuant to 29 U.S.C. § 216(b), a copy of which consent is attached hereto as Exhibit C. Weimer brings this action on behalf of himself and all similarly situated current and former employees of Defendants during

11

the applicable limitations period.

22.     Plaintiff Kristinn Renee Robeda Waters ("K. Waters") is an adult individual residing in Dover, Delaware. K. Waters was employed by Defendants as a GPS Field Technician within DRG's Utility Access Management, Joint Use, and Mobile Resource Equipment divisions from October 2024 through March 7, 2026. At all relevant times, K. Waters was paid an hourly rate of $20 was classified by Defendants as a non-exempt employee eligible for overtime compensation under the FLSA and applicable state law, and was subject to the productive hours and quota-based compensation system described herein. K. Waters consents in writing to be a party plaintiff in this FLSA collective action pursuant to 29 U.S.C. § 216(b), a copy of which consent is attached hereto as Exhibit D. K. Waters brings this action on behalf of herself and all similarly situated current and former employees of Defendants during the applicable limitations period.

23.     Plaintiff Michael Philip Prystaloski ("Prystaloski") is an adult individual residing in Cambridge Springs, Pennsylvania. Prystaloski was employed by Defendants as a GIS Technician in DRG's GIS/Data Collection division from approximately May 2023 through April 2024. At all relevant times, Prystaloski was paid an hourly rate of $20, was classified by Defendants as a non-exempt employee eligible for overtime compensation under the FLSA and applicable state law and was subject to the productive hours and quota-based compensation system described herein. Prystaloski consents in writing to be a party plaintiff in this FLSA collective action pursuant to 29 U.S.C. § 216(b), a copy of which consent is attached hereto as Exhibit E. Prystaloski brings this action on behalf of himself and all similarly situated current and former employees of Defendants during the applicable limitations period.

**Defendants**

24.     Defendant Davey Resource Group, Inc. ("DRG") is a corporation organized and

existing under the laws of the State of Ohio, with its principal place of business located at 295 S. Water Street, Kent, Ohio 44240. DRG is a wholly owned subsidiary of The Davey Tree Expert Company. DRG is registered to conduct, and at all relevant times has conducted, business throughout the United States, deploying field workforces across the United States to perform utility asset management, GIS data collection, joint-use pole inspection, vegetation management, and related field services for utility clients. At all relevant times, DRG has been an "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), and an "employer" within the meaning of the OMFWSA, R.C. § 4111.02. At all relevant times, DRG has been engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(b) and (s), and its annual gross volume of sales or business done has not been less than $500,000.

25.    Defendant The Davey Tree Expert Company ("Davey Tree") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 1500 North Mantua Street, Kent, Ohio 44240. Davey Tree is the parent corporation of DRG and, at all relevant times, has exercised operational, financial, and policy-level control over DRG's compensation practices, workforce deployment, and human resources policies sufficient to constitute joint employer status within the meaning of the FLSA and the OMFWSA. Specifically, Davey Tree and DRG share common ownership and management; Davey Tree's corporate infrastructure governs and administers the human resources, payroll, and compensation policies applicable to DRG's field workforce; and the productive hours compensation system and related directives at issue in this action were adopted, ratified, and enforced through the centralized management structure of the Davey enterprise of which both Defendants are a part. At all relevant times, Davey Tree has been an "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), and an "employer" within the meaning of the OMFWSA, R.C. § 4111.02, and is jointly and

severally liable with DRG for the violations alleged herein.

26.     The compensation policies challenged in this action were centrally adopted, collectively ratified, and uniformly enforced across Defendants' field workforce through the coordinated management structure of DRG and Davey Tree. Defendants jointly governed the wage policies and practices applicable to Plaintiffs and the members of the FLSA Collective and Rule 23 Class through their control over: the productive hours and quota methodology used to calculate compensable time; the deployment and assignment of field technicians to remote projects across multiple states; the assignment and maintenance obligations for company vehicles; the mandatory meeting and safety program requirements applicable to all field technicians; the timekeeping and payroll systems used to record and process hours worked; and the authority to establish, modify, and enforce compensation policies across all DRG projects and divisions.[2] By virtue of that joint control over the terms and conditions of Plaintiffs' employment, each Defendant is an "employer" of Plaintiffs and the class and collective members within the meaning of 29 U.S.C. § 203(d) and R.C. § 4111.02, and each is jointly and severally liable for the violations alleged herein. Plaintiffs reserve the right to seek leave to amend this Complaint to add individual defendants upon identification, through discovery or otherwise, of the corporate officers, directors, or managers who adopted, ratified, or had ultimate authority over the unlawful compensation policies and adverse employment actions described herein.

<b><u>FACTS COMMON TO ALL PLAINTIFFS</u></b>

**A.  <u>DRG's Business Operations and Field Workforce</u>**

27.     DRG, a wholly-owned subsidiary of Davey Tree, is a utility infrastructure service

---

[2] Defendants' centralized control is further reflected in the Davey Employee Handbook, which applies to The Davey Tree Expert Company and all its U.S. subsidiaries and requires employees to comply with Davey policies, procedures, rules, regulations, and instructions. *See* Davey Tree Employee Handbook excerpts, at p. 5, attached as Exhibit J.

company that provides pole inspection, joint-use make-ready analysis, GIS data collection, vegetation management, and related field services to utility clients throughout the United States. At all relevant times, DRG has operated in multiple states, deploying mobile workforces of field technicians to perform inspections and data collection on utility poles owned and/or maintained by clients including, but not limited to: AT&T, PA West Penn Power, Duke Energy, Delaware Electric Co., Potomac Edison Power Company, Central Maine Power, among many others.

28. At all relevant times, Defendants employed Plaintiffs and the members of the FLSA Collective and Rule 23 Class as field technicians (variously referred to as "technicians," "inspectors," "coordinators" or similar titles) whose primary job duty is to travel to and inspect utility poles within assigned geographic territories, record inspection data, and submit that data through Defendants' designated platforms. Field technicians are non-exempt hourly employees subject to the overtime requirements of the FLSA and applicable state law.

29. Defendants deploy their field technicians to remote project sites, often hundreds of miles from their homes, where they are required to operate company-provided vehicles, comply with Defendants' safety protocols, complete quality-control documentation, perform vehicle maintenance, and attend mandatory meetings and briefings. Each of these activities is an integral and indispensable part of Defendants' field operations and is performed for the primary benefit of Defendants and their clients.

30. At all relevant times, Defendants maintained a centralized management structure through which supervisors and project managers communicated compensation policies, production expectations, quality-control requirements, and operational directives to field technicians via text message, email, and group messaging platforms including Google Chat. These communications, issued by named supervisors including Joshua Meriwether, Jay Halsey, Javier Gonzales, Colton

15

Westover, and Lloyd Napier, among others, constitute official management communications binding on all field technicians to whom they were directed.

### B. The Productive Hours Compensation System

31.     At all relevant times, DRG has compensated its field technicians not for the actual hours they work, but through a system known internally as the "productive hours" methodology—a quota-based formula that calculates compensable time by dividing the number of utility poles completed by a fixed, employer-mandated "standard" production rate. This production rate is project-specific and varies from project to project. Employees are informed about the required quota upon commencement of each new project. This formula, and not the actual clock time worked, governs the hours that Defendants report and compensate.

32.     For example, for one specific project with client AT&T, Defendants codified the productive hours system in a written internal document titled "DFC/UKG Hours Calculation Guide" (the "Calculation Guide"), which they distributed to and enforced against field technicians at all relevant times. A true and correct copy of this Calculation Guide is attached hereto as Exhibit F.

33.     The Calculation Guide states, in relevant part, that "[p]roductive hours are calculated by dividing the total number of poles completed by the standard rate" for each work category, and sets the following production rates as the standard applicable to field technicians assigned to the AT&T project:

(a)     AT&T Only:                          12 poles per hour;
(b)     AT&T + Third Party:                 12 poles per hour;
(c)     AT&T + CEI:                         12 poles per hour;
(d)     AT&T + Third Party + CEI:  12 poles per hour; and
(e)     CEI + Third Party:                  20 poles per hour.

34.     Under this productive hours formula, a technician who completes 24 AT&T poles

16

in a workday is compensated for 2.0 hours of work (24 ÷ 12 = 2), regardless of whether it actually took that technician 4, 5, or 6 hours to complete those poles, and regardless of the additional hours of work performed before, during, and after pole inspections that are not captured by the formula. Similarly, a technician who completes 36 poles in an AT&T + Third Party category is compensated for only 3.0 productive hours, irrespective of actual time expended. This is especially significant because oftentimes, field workers may encounter external challenges that may limit their ability to meet quotas, such as difficult terrain, weather constraints, heavy traffic among many other variables outside of their control.

35.     The Calculation Guide expressly identifies three categories of work that "do not count toward productive pole hours" and are expressly treated as non-compensable: (a) "Non-Production," (b) "Drive Time," and (c) "QA" Activities. *See* Exhibit F. The Calculation Guide states that both "Non-Production" and "Drive Time", two of the three categories through which a technician might otherwise record actual working time, "must be approved by Joshua Meriwether." As set forth below, by conditioning the recording of drive time and non-production time on managerial approval, Defendants created a systemic barrier to the accurate recording of compensable hours.

36.     The Calculation Guide further provides that in the event a technician is "unable to hit project standard pole count," Defendants will calculate that technician's compensable time based on "the technician's first audited pole and last audited pole of the day," a methodology that excludes all work performed before the first pole inspection and after the last, including pre-shift vehicle checks, mandatory quality-control tasks, meetings, and other activities performed at management's direction. The Calculation Guide expressly cautions that "[i]f an inability to hit project standard pole count" persists, "further investigation will occur," a coercive warning that

17

discourages technicians from accurately recording time not captured by the quota formula.[3]

### C. Drive Time: Compensable Work Excluded from the Productive Hours Formula

37.     At all relevant times, Defendants have required field technicians to drive company-provided vehicles from their assigned lodging location to the project sites where they perform pole inspections each morning, and from those project sites back to their lodging location at the end of each shift. Both the outbound morning drive and the return evening drive constitute compensable work time under the FLSA and applicable state law. Neither drive constitutes ordinary home-to-work commuting excludable under the Portal-to-Portal Act. Notwithstanding the compensable nature of intra-shift drive time, Defendants' Calculation Guide expressly excludes "Drive Time" from the productive hours formula and, as noted above, conditions any recording of drive time on the prior approval of a named supervisor. By design, this approval requirement effectively eliminates drive time from the payroll records of the vast majority of field technicians, who are not regularly granted such approval and who understand that requesting approval for non-productive time creates adverse scrutiny regarding their production performance.

38.     The compensability of field technicians' morning drive time is further established by the structure of Defendants' operations. Each morning, before departing the lodging, technicians perform mandatory pre-departure tasks, including quality-control review, vehicle inspection, equipment loading, and attendance at required safety meetings, that constitute principal activities of the workday. Once a principal activity has commenced, the continuous workday has begun, and all subsequent time until the last principal activity of the day is completed constitutes compensable hours worked. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). The morning drive to the field

---

[3] Defendants' productive-hours system conflicted with Defendants' own written timekeeping policy, which recognized that federal and state law require accurate records of non-exempt employees' time worked and that time worked includes time actually spent performing assigned duties on behalf of the Company. *See* Exhibit J at pp. 36-37.

follows these principal activities and therefore falls within, not before, the continuous workday.

39.     This compensability is independently supported by the structure of Defendants' operations: technicians are dispatched in company vehicles to assigned territories, are required to carry and use Defendants' equipment while driving and are under Defendants' direction and control throughout the drive to and between inspection sites. In these circumstances, the morning drive is an integral and indispensable part of the workday, not a preliminary or postliminary activity excludable under the Portal-to-Portal Act.

40.     As set forth in Section D below, the return evening drive is independently compensable because it connects two principal work activities, field inspections and the mandatory end-of-day data upload at the lodging, rendering the entire period between first and last principal activity compensable as a matter of law.

### D.  Post-Shift Data Upload Obligations and the Compensability of the Return Drive

41.     Defendants' core business deliverable is the collection, compilation, and submission of accurate utility pole inspection data to its clients. To fulfill this obligation, Defendants require field technicians to upload and submit the inspection data they collect in the field each day before that data is processed and transmitted for client use. This data upload obligation is a mandatory, non-discretionary job requirement imposed on field technicians at the direction and for the benefit of Defendants. It constitutes a principal activity of the workday.

42.     The daily data upload could not practicably be performed in the field. Defendants' own data-upload instructions state that a stable Wi-Fi connection is required to upload photographs, sync field data, and/or complete related data-submission tasks through Defendants' required systems. See Data Upload Instructions, at p. 7, attached as Exhibit G. That technical requirement generally could not be satisfied in the remote, rural, and infrastructure-limited

locations where Defendants deployed field technicians to perform pole inspections. As a result, field technicians were generally unable to complete their required daily uploads until they returned to their assigned lodging, where stable Wi-Fi access was available. The lodging location was therefore not merely a place of rest; it was the location at which required work activity, including end-of-day data upload and syncing, had to be performed each evening.

43.     Defendants have communicated the data upload requirement to field technicians through supervisory directives and operational instructions and have treated failure to timely upload daily data as a performance deficiency subject to disciplinary action. These communications establish that Defendants exercise control over the data upload activity, expect technicians to perform it at the conclusion of each shift, and treat it as an accountability obligation rather than a discretionary or voluntary task.

44.     Because field technicians are required to perform data upload and synching as principal work activities, upon returning to their lodging location each evening, and because Defendants' own instructions require a stable Wi-Fi connection for those tasks, the return drive from the field to the lodging is compensable time under the continuous workday doctrine established in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), and its progeny of cases. *See* Exhibit G.

45.     Under that doctrine, once the continuous workday has begun, all time until the last principal activity of the workday is completed constitutes compensable hours worked. Where a technician drives from the field to the lodging and then performs a required data upload at the lodging, the data upload is the last principal activity of the workday, and the drive that precedes it falls squarely within the continuous workday. It is not a post-shift commute home; it is travel between a worksite and the location where work continues.

46.     This analysis is reinforced by the nature of the lodging arrangement itself.

20

Defendants deploy field technicians to remote project sites far from their homes and arrange or direct their lodging in the project area for the duration of each deployment. The lodging is not the technicians' home; it is the employer-designated base of operations from which technicians perform pre-inspection duties, depart for the field each morning and to which they return each evening to complete their daily data upload obligations. The round-trip between the lodging and the field—both the outbound morning drive and the return evening drive—takes place entirely within the continuous workday and is therefore compensable.

47. Defendants' productive hours formula compensates technicians only for the middle segment of this continuum, the pole inspections themselves (based on an arbitrary productivity system, not actual hours worked), and excludes the required bookending pre-inspection duties, drives and the post-shift data upload entirely. The resulting wage shortfall affects every field technician on every workday of their deployment and produces systematic and recurring underpayment of compensation, including overtime.

**E.  <u>Off-the-Clock Quality-Control Work Performed Before Field Deployment</u>**

48. Defendants require field technicians to complete quality-control ("QC") reviews and corrections, reviewing data entries, resolving flags or errors in Defendants' systems, and clearing open QC issues, before departing for the field each day. DRG management has communicated this requirement explicitly and in writing and has threatened disciplinary action against technicians who leave for the field with open QC issues outstanding.

49. For example, in a written communication disseminated to all field technicians through DRG's official Google Chat group ("CEI Check In/Out Only"), supervisor Jay Halsey stated: "Guys this map is nothing but red this is unacceptable and will not be tolerated . . . if your qc are not done before ya leave for the field from now on we will be issuing write ups. if they are

qc issues that have to be fixed by office you need a ql around it showing so. Any other qc issue not done before leaving for the field is unacceptable." A true and correct copy of this communication is attached hereto as Exhibit H.

50. In a separate written communication disseminated through the same Google Chat group, supervisor Josh Meriwether similarly directed technicians: "Qc issues are to be cleared before you are in field or your supervisor updated," and expressly stated that leadership expected technicians to be "updating your leadership on Qc issues that are continuing to pop up" in the field documentation. A true and correct copy of this communication is attached hereto as Exhibit I.

51. The QC work required by Defendants prior to daily field deployment is compensable work under the FLSA and applicable state law. It constitutes a principal activity, not a preliminary or postliminary task, that Defendants require as an integral and indispensable part of the technician's job duties. Because it is performed at the direction and for the benefit of Defendants before technicians are permitted to proceed to the field, it triggers the continuous workday under applicable FLSA regulations. Defendants do not compensate technicians for this time under the productive hours formula, which does not begin running until a technician's first pole inspection.

52. So too with the post-shift data upload obligation described in Section D above: the daily upload of field inspection data at the lodging upon the technician's return from the field is a mandatory, employer-directed work activity that constitutes a principal activity of the workday independent of, and in addition to, the pole inspections that precede it. Defendant similarly does not compensate technicians for that time under the productive hours formula, which ceases running at the technician's last pole inspection and excludes all work performed at the lodging thereafter.

53. The pre-departure QC obligation and the post-shift data upload obligation are

mirror images of each other in both legal character and legal consequence. Each is a principal activity that Defendants mandate, control, and decline to compensate. Together, they establish three things: the compensable workday begins at the lodging, not at the first pole inspected; the compensable workday ends at the lodging, not at the last pole inspected; and every activity in between (the morning drive, the field inspections, and the return drive) falls within the continuous workday for which full compensation is owed.

### F. Vehicle Maintenance: Forced Clock-Outs for Required Work Activities

54.     As part of their employment, Defendants' traveling workforce are required to maintain company-provided vehicles in working order, including taking vehicles to repair shops for performance of regular oil changes and repairs as well as cleaning, and other upkeep tasks. Vehicle maintenance and upkeep are imposed on technicians as a condition of employment and are performed for Defendants' direct benefit: the maintenance of Defendants' fleet. Defendants' Handbook required employees using Company property, including Company vehicles and tools, to exercise care, perform required maintenance, follow applicable operating instructions and safety standards, and notify supervisors when vehicles or equipment appeared damaged, defective, or in need of repair. The Handbook further provided that failure to maintain or properly use Company property could result in discipline, up to and including termination. *See* Davey Employee Handbook excerpts, at p. 28, attached as Exhibit J.

55. Separately, Defendants' management directive instructed field employees that vehicle maintenance and upkeep were part of their job, that drive time to vehicle maintenance was not paid, that payable maintenance time was capped at 0.5 hours, and that employees had to clock out if maintenance exceeded 0.5 hours. *See* Davey Tree Vehicle Maintenance and Upkeep Directive, attached as Exhibit K. Defendants continuously reinforced these obligations and directives in

23

writing through management communications expressly stating that "[v]ehicle maintenance and upkeep are part of your job here at Davey." *See* Holiday Incentive, Production Incentive and Vehicle Maintenance email from Supervisor Javier Gonzalez originally sent to numerous employees on November 22, 2025 and re-sent on January 17, 2026, attached as Exhibit L.

56. Notwithstanding the mandatory and work-related nature of vehicle maintenance, Defendants' compensation policy expressly imposes a strict 30-minute cap on the amount of time a technician may charge to DRG's profit center to be compensated for time spent on vehicle maintenance. The written Maintenance and Upkeep Directive stated: "The maximum amount of time that you can charge to the profit center for vehicle maintenance is .5 hours (30 minutes). If vehicle maintenance takes longer than .5 hours, you are required to clock out until maintenance is complete and you are back in the field working. No exceptions."[4] *See* Exhibits K and L.

57. The Maintenance and Upkeep Directive further states that technicians are "not paid drive time to the location for vehicle maintenance," and that "[v]ehicle maintenance is not an excuse for not hitting your weekly projected hours or your hours for the month." *See* Exhibits K and L. By pairing a pay cap on maintenance time with a production quota requirement and making clear that maintenance will not justify any shortfall in productive hours, Defendants created a structure that financially penalizes employees for the time they spend performing mandatory vehicle maintenance beyond the arbitrary 30-minute threshold.

58. Field technicians performing vehicle maintenance on deployment are not waiting at a shop of their choosing on their own time. They are stranded—in the field, in an unfamiliar location, with a company vehicle they are required to maintain and are not permitted to leave

---

[4] The lack of personal freedom during maintenance was reinforced by Defendants' vehicle rules: company vehicles were entrusted to specific employees, personal use was prohibited absent written approval, and employees were required to comply with Defendants' vehicle, maintenance, and safety requirements. *See* Exhibit J at p. 28.

24

behind. They have no choice but to wait until the repair shop releases the vehicle before their workday can resume. That waiting time is compensable work time under the FLSA: it is mandatory, employer-directed, and leaves the technician with no meaningful freedom to use the period for personal purposes. Defendants' 30-minute cap does not change that analysis. A self-imposed administrative limit cannot lawfully extinguish an employee's right to compensation for hours actually worked. By requiring technicians to clock out the moment maintenance exceeds thirty minutes, Defendants have converted a mandatory work obligation into an off-the-clock one—deliberately, in writing, and uniformly across their entire field workforce.

59.     The Maintenance and Upkeep Directive imposes an additional constraint on routine vehicle upkeep and housekeeping, permitting technicians to charge no more than thirty minutes of cleaning and general maintenance time per two-week period. Defendants' own communications describe their vehicles as "rolling billboards" representing the company and require that they be kept clean and presentable at all times. *See* Exhibits K and L. Such a cap is irreconcilable with the obligations it imposes, which directly impact upon vehicle safety.

### G. Weather Delays: Compelled Clock-Outs for Waiting Time Within the Workday

60.     Defendants' field technicians perform outdoor work that is susceptible to be interrupted by weather conditions, including lightning and severe storms. Federal law requires that employees who are required to remain at or near the workplace during weather delays, and who are not free to use the delay time for their own purposes, must be compensated for that waiting time as hours worked *See* 29 C.F.R. §§ 785.15–785.16; *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).

61.     Notwithstanding this requirement, DRG has adopted and enforced a written policy under which field technicians are directed to clock out whenever work is interrupted by lightning

25

or other dangerous weather conditions, and to remain clocked out for the duration of the weather delay. For example, this policy was communicated by Josh Meriwether in an official written directive disseminated through DRG's Google Chat group, noting: "Everyone please be safe during intense weather situations if there is persistent lightning strikes clock out and wait for 30 min stop until 30min worth of clarity before you should continue working." A true and correct copy of this weather clock-out directive from Joshua Meriwether, dated March 11, 2026, is attached hereto as Exhibit M.

62.     The same directive instructed technicians that "IT IS OUR RESPONSIBILITY TO LOOK AT THE WEATHER AND PLAN ACCORDINGLY AHEAD OF TIME SO BE SURE WE ARE ATTEMPTING TO MAKE UP ANY LOST HOURS LATER ON IN THE WEEK." *See Id*. Three consequences follow from this language, each independently significant. First, Defendants treated weather delays not as compensable waiting time but as a workforce planning problem and placed responsibility for that problem on the technicians. Second, technicians were required to perform additional field work later in the week to replace hours lost to weather delays, without any compensation beyond what the productive hours formula would have generated for those hours in the ordinary course. Third, and most significantly, the two injuries compounded each other: technicians were denied pay for waiting, required to work additional hours to make up for it, and then underpaid for those make-up hours under the same formula that underpays for every other hour they work. Where make-up hours pushed a technician's weekly total above forty, the overtime premium was calculated on compressed productive hours rather than actual hours worked, reducing the premium owed and compounding the loss a second time.

63.     During weather delays, field technicians are not relieved of their duties. They remain in the field in company vehicles, subject to Defendants' control and direction, unable to

26

leave the worksite and use the delay period for personal purposes. Under applicable FLSA standards governing waiting time, this time is compensable. Defendants' weather clock-out policy is an unlawful mechanism for stripping technicians of pay for time spent under Defendants' control and direction.

### H.  The Production Incentive Program as a Quota-Enforcement Mechanism

64.     Defendants implemented and maintained a "Production Incentive Program" (the "Incentive Program") that is directly linked to the productive hours quota system and functions as a mechanism of quota enforcement. The Incentive Program offers financial bonuses, available "week over week", to technicians who satisfy production threshold requirements within a given week.

65.     Eligibility for the Incentive Program requires, among other criteria, a minimum of 45 productive hours worked in the relevant week and the satisfaction of minimum project-specific production requirements for that week. The Incentive Program was communicated to field technicians in written directives forwarded through management (the "Incentive Directive"), a true and correct copy of which is attached hereto as Exhibit L.

66.     The Incentive Program operates as a quota-enforcement mechanism in two analytically related respects. First, it creates a strong financial incentive for technicians to report the minimum number of productive hours required for eligibility, 45 per week, and to prioritize pole counts over accurate time-recording. Second, by attaching bonus eligibility to the same productive hours metric that Defendants use to calculate base compensation, the Incentive Program reinforces the systematic underreporting of compensable hours by making accurate time-recording economically adverse to the technician. A technician who records drive time, QC work, or weather-delay time as hours worked risks reducing the apparent productivity of his or her time (lowering

27

poles-per-hour ratios) and jeopardizing bonus eligibility and knows that Defendants condition the recording of non-productive time on supervisory approval that is routinely withheld.

67. The Holiday Incentive Program similarly conditions a $150 holiday bonus on the employee working a minimum of 40 productive hours during the holiday pay period, a threshold calculated exclusively using the productive hours metric, thereby further cementing the centrality of that metric to technicians' overall compensation and further incentivizing the underreporting of non-productive compensable time. *See* Exhibit L.

### I. **Willfulness and Damages**

68. Defendants did not stumble into underpaying their workforce. The productive hours formula was a deliberate construction, and its exclusions were not oversights but willful design choices.

69. Defendants' compensation formula compensates field technicians for pole inspections and nothing more. It does not compensate them for the quality-control work Defendants required each morning before technicians could depart the hotel. It does not compensate them for the drive to the field, made in Defendants' vehicles, under Defendants' operational direction, carrying equipment Defendants supplied and required. It does not compensate them for the return drive, which ended not at home but at a hotel, where Defendants mandated same-day data submissions that the remote areas where technicians worked could not support. It does not compensate them for time spent on those submissions themselves, non-discretionary daily obligations that Defendants actively monitored and enforced as a condition of satisfactory job performance. It does not compensate them for time spent waiting in company vehicles during weather events, subject to Defendants' written directive requiring technicians to remain on site until conditions permitted resumption of work. It does not compensate them for

28

vehicle maintenance beyond thirty minutes, for work performed on Defendants' fleet, at Defendants' direction, in locations technicians had no authority to leave. Each of these obligations is identified in Defendants' own written policies as a mandatory component of the job. Defendants knew precisely what the formula excluded. They wrote it.

70. When technicians sought to record that time through the formula's only alternative mechanism, supervisory approval for non-productive entries, Defendants withheld that approval as a matter of practice and policy. Work performed in fact was rendered invisible on paper.

71. Defendants reduced this system to writing, distributed it through official management channels, and enforced it uniformly across every project and every state in which they operated. When a technician sought compensation for time the formula did not capture, Defendants characterized the request as theft and took disciplinary actions, including termination.

72. Yet Defendants' own written policies instructed employees to report compensation, pay, and timekeeping concerns through Company channels. Defendants' Handbook states that employees with concerns about work conditions or compensation should voice those concerns to their supervisors, any other supervisor, or Human Resources; that employees must report pay discrepancies and time-record errors to their supervisor, Payroll, or Human Resources; and that Company policy prohibits anyone from instructing or encouraging employees to work off the clock, inaccurately report hours worked, or alter time records. The Handbook also states that employees may not be terminated or discriminated against because they inquire about, discuss, or disclose pay. *See* Davey Employee Handbook excerpts at pp. 7, 36–38, attached as Exhibit J. Defendants nevertheless retaliated against employees who recorded, reported, or complained about compensable time that Defendants' productive-hours system excluded from overtime calculations, including by characterizing such time entries or complaints as improper, false, or time theft and by

29

taking adverse employment actions against them. *See* Counts II and IV, *infra*.

73.     Accordingly, the applicable three-year limitations period governing willful violations of the FLSA applies to all claims asserted herein. *See* 29 U.S.C. § 255(a).

74.     As a direct and proximate result of Defendants' unlawful compensation policies and practices, Plaintiffs and the members of the FLSA Collective and Rule 23 Class have suffered lost wages, including, but not limited to, unpaid overtime wages at the applicable one-and-one-half-times rate for hours worked in excess of forty per week, in amounts to be determined at trial.

## REPRESENTATIVE PLAINTIFF EXPERIENCES

75.     The following section sets forth the individual factual experiences of each Representative Plaintiff with Defendants' compensation policies and practices. These allegations are intended to illustrate how Defendants' common policies affected Plaintiffs and similarly situated employees; Plaintiffs do not plead them as an exhaustive account of every uncompensated work activity, workweek, project, or damages calculation.

### A.  Plaintiff Vincenzo S. Prattico, Jr.

76.     Plaintiff Vincenzo S. Prattico, Jr. ("Prattico") was employed by Defendants as a GPS Field Technician within DRG's Utility Asset Management division from approximately October 21, 2022 through April 26, 2026. At all relevant times, Prattico was paid on an hourly basis at approximately $23.00 per hour, was classified by Defendants as a non-exempt employee, and was eligible for overtime compensation under the FLSA and applicable state law. During his employment, Prattico worked on remote field assignments in multiple states, including Pennsylvania, North Carolina, South Carolina, Delaware, West Virginia, Michigan, Tennessee, New York, Maine, Kentucky and Ohio,  and was subject to Defendants' productive-hours and quota-based compensation system.

30

77.     Prattico's primary job duties included traveling to assigned utility field locations, inspecting and/or collecting data concerning utility poles and related infrastructure, recording field data, and submitting that data through Defendants' required systems. Defendants assigned Prattico a company vehicle and required him to use company-issued equipment, including camera, iPad, measuring equipment, safety equipment and other tools, to perform his field work. While on remote assignments, Prattico stayed in lodging selected, arranged, approved, and/or directed by Defendants and began and ended workdays from that lodging.

78.     On remote deployment days, Prattico regularly performed required work before reaching the first pole or field location of the day. This pre-departure work included, among other tasks, reviewing and addressing quality-control issues, checking assignments, planning his route, communicating with supervisors or dispatch, inspecting the company vehicle, and loading required tools and equipment into the vehicle. Prattico also attended mandatory safety or toolbox meetings, including periodic Monday safety meetings. These tasks were performed at Defendants' direction and for Defendants' benefit, but Defendants did not record or compensate Prattico for all time spent performing them.

79.     After completing required pre-departure tasks, Prattico drove from his assigned lodging to his first field location in a company vehicle carrying Defendants' tools and equipment. His drive from lodging to the field typically took approximately 30 minutes to 1 hour each way, depending on the project, territory, weather, traffic, and distance between lodging and the assigned work area. At the end of the field day, Prattico drove from the final field location back to his assigned lodging. Defendants generally excluded this drive time from Prattico's paid hours, even though the drives occurred after required work had begun and before required work had ended.

80.     After returning to his assigned lodging, Prattico was required to perform post-shift

31

work, including uploading and syncing field data, photographs, and/or inspection information; responding to quality-control issues; and completing or transmitting required reports or daily information through Defendants' systems. Because Prattico's field assignments were often in remote areas where stable internet access was unavailable or unreliable, this post-shift work generally had to be completed at the lodging location. This post-shift work typically took approximately 10 to 45 minutes per day, depending on the project and volume of data. Defendants did not record or compensate Prattico for all time spent performing this work.

81. Defendants did not pay Prattico based on all hours actually worked. Instead, Defendants calculated his compensable time under their productive-hours system, which credited time based principally on the number of poles or units completed, applicable production expectations, or the time between the first and last audited field entry. As applied to Prattico, that system failed to capture substantial required work performed before the first recorded field entry and after the last recorded field entry, including pre-departure work, drive time, post-shift data work, and other non-production duties. Defendants also required supervisory approval before certain categories of non-productive time, including drive time, could be recorded, and such time was not consistently approved or paid.

82. Prattico regularly worked more than forty hours in a workweek when all compensable time was counted, including field work, pre-departure duties, drive time, post-shift data work, meetings, vehicle-related duties, and other required work. However, because Defendants credited only productive hours or otherwise excluded required non-production time, Defendants failed to pay Prattico for all hours worked and failed to pay overtime compensation at one and one-half times his regular rate for all hours worked over forty in a workweek. For example, during one or more workweeks in approximately January 2026, Prattico worked more than forty

32

actual hours, but Defendants paid him for fewer than all compensable hours worked and failed to pay the full overtime premium owed. Defendants' payroll, timekeeping, productivity, GPS, and project records will further identify the precise workweeks and amounts owed.

83. Defendants also required Prattico to maintain, refuel, clean, and otherwise care for his company-assigned vehicle so that it could be used for Defendants' field operations. Defendants limited compensable vehicle-maintenance time to 30 minutes and did not compensate Prattico for all time spent driving to maintenance locations, obtaining approval for maintenance, waiting for required service, or remaining with the company vehicle while service was performed. On one or more occasions, vehicle maintenance and related waiting time exceeded the amount Defendants permitted Prattico to record, and Prattico was not paid for all such time, even though he was performing a required work activity and was not free to use the time for his own purposes.

84. Prattico also experienced work interruptions caused by weather and other field conditions while on active deployment. When lightning, severe weather, or similar conditions interrupted work, Defendants required or instructed Prattico to stop working, remain in or near the field location or company vehicle, and wait until work could safely resume. Defendants did not compensate Prattico for all such waiting time and instead treated the time as non-compensable or required Prattico to make up the time later in the week. Defendants' exclusion of this waiting time further reduced Prattico's recorded hours and the hours counted toward overtime, causing Defendants to understate and underpay the overtime compensation owed.

85. Defendants' productive-hours system and related policies also discouraged Prattico from accurately recording all compensable work time. Because Defendants tied compensation, productivity expectations, and incentive eligibility to productive-hours metrics, recording non-production time such as drive time, vehicle maintenance time, weather-delay time, or pre- and

33

post-shift work could reduce a technician's apparent productivity or invite supervisory scrutiny. As a result, Prattico and similarly situated field technicians were not paid for all compensable time worked.

86. As a result of Defendants' policies and practices, Prattico was deprived of compensation for required work performed before, during, and after his field assignments, including overtime compensation for hours worked in excess of forty in a workweek. Prattico brings these claims on behalf of himself and all similarly situated employees who were subject to the same or similar productive-hours system and related timekeeping practices.

### B. Plaintiff Justinn Charles Manuel Waters

87. Plaintiff Justinn Charles Manuel Waters ("J. Waters") was employed by Defendants as a Utility Auditor and Coordinator within DRG's Joint Use, GIS/Data Collection, Make Ready Engineering ("MRE"), and Asset Management operations from approximately September 2023 through April 2026. At all relevant times, J. Waters was paid at approximately $21.50 per hour, was classified by Defendants as a non-exempt employee, and was eligible for overtime compensation under the FLSA and applicable state law. During his employment, J. Waters reported primarily to Javier Gonzales and, from approximately March 2026 through April 2026, to Joshua Meriwether. J. Waters worked on remote field assignments in multiple states, including Delaware, Pennsylvania, West Virginia, Michigan, Massachusetts, New York, Ohio, Tennessee, and Kentucky, and was subject to Defendants' productive-hours and quota-based compensation system.

88. J. Waters' primary job duties included traveling to assigned utility field locations, inspecting and/or collecting data concerning utility poles and related infrastructure, recording field data, and submitting that data through Defendants' required systems. Defendants assigned J.

34

Waters a company vehicle, a Toyota Tacoma, and required him to use and transport company-issued equipment, including safety materials and, on MRE projects, cameras and a 17-foot measuring stick. While on remote assignments, J. Waters stayed in lodging selected, arranged, approved, or directed by Defendants and began and ended many workdays from that lodging.

89. On remote deployment days, J. Waters regularly performed required work before reaching the first pole or field location of the day. This pre-departure work included, among other tasks, reviewing and correcting quality-control issues from the prior day, checking assignments, planning his route, conducting a vehicle walk-around inspection, loading tools and equipment into the company vehicle, uploading or syncing prior-day data, and communicating with supervisors or dispatch. J. Waters also attended mandatory safety or toolbox meetings, including weekly Monday safety meetings that generally lasted approximately 30 to 60 minutes and were held by Zoom or in person. Beginning in or around February 2026 on the Ohio project, J. Waters was required to have work corrections completed before going to the field at approximately 7:30 a.m. These tasks were performed at Defendants' direction and for Defendants' benefit, but Defendants did not record or compensate J. Waters for all time spent performing them.

90. After completing required pre-departure tasks, J. Waters drove from his assigned lodging to his first field location in a company vehicle carrying Defendants' tools and equipment. His drive from lodging to the first field location typically took approximately 30 minutes, depending on the project, territory, weather, traffic, and distance between lodging and the assigned work area. At the end of the field day, J. Waters drove from the final field location back to his assigned lodging, a return trip that could take up to approximately 1.5 hours depending on the project, location, traffic, and field conditions. Defendants generally excluded this drive time from J. Waters' paid hours, even though the drives occurred after required work had begun and before

35

required work had ended.

91.     After returning to his assigned lodging, J. Waters was required to perform post-shift work, including uploading photographs, syncing ArcGIS or other data platforms, completing or transmitting daily reports and inspection logs, and responding to supervisor communications or quality-control feedback. On MRE projects, uploading photographs could take up to approximately one hour. Syncing data platforms generally took approximately 15 minutes, daily reports or inspection logs generally took approximately 10 to 15 minutes, and responding to supervisor communications or quality-control feedback could take up to approximately 30 minutes. Defendants expected this post-return work to be performed off the clock and did not record or compensate J. Waters for all time spent performing it.

92.     Defendants did not pay J. Waters based on all hours actually worked. Instead, on many projects, Defendants calculated his compensable time under their productive-hours system, which credited time based principally on the number of poles or units completed, applicable production expectations, or the time between the first and last audited field entry. As applied to J. Waters, that system failed to capture substantial required work performed before the first recorded field entry and after the last recorded field entry, including pre-departure work, hotel-to-jobsite drive time, post-shift data work, meetings, vehicle-related duties, and other non-production tasks. J. Waters understood that his paid time was generally tied to the first pole and last pole of the day and/or to the applicable production rate, rather than to all time actually worked. Drive time was treated as part of the production period but did not count toward paid hours unless the production rate was met. Management confirmed this treatment of drive time and productive time in weekly meetings and through written or electronic communications. Defendants' records will identify the precise production rates, credited hours, and pay calculations applicable to J. Waters.

93.     J. Waters regularly worked more than forty hours in a workweek when all compensable time was counted, including field work, pre-departure duties, hotel-to-jobsite drive time, drive time between field locations, return drive time to lodging, post-shift data work, meetings, vehicle-related duties, and other required work. J. Waters estimates that he typically worked at least approximately 70 actual hours per week, while Defendants typically recorded far less. When Defendants paid overtime, they paid overtime based on the reduced number of hours Defendants recorded or credited, not based on all compensable hours J. Waters actually worked. For example, during the workweek of April 5 through April 11, 2026, J. Waters estimates that he worked approximately 56 actual hours, including pre-departure work, hotel-to-jobsite travel, active field work, between-site travel, return travel to lodging, post-return work, mandatory meeting time, and other required work, but Defendants recorded or paid only approximately 50 hours and paid only approximately 10 overtime hours. Defendants therefore failed to count all compensable hours when determining whether J. Waters worked more than forty hours in a workweek and failed to pay the full overtime compensation owed for all hours worked over forty.

94.     Defendants required J. Waters to maintain, refuel, clean, and otherwise care for his company-assigned Toyota Tacoma so that it could be used for Defendants' field operations. J. Waters was responsible for basic maintenance, including oil changes, tire replacement, washing, and other service, as well as major repairs when needed. Basic maintenance could take up to approximately one hour, and major repairs could take four hours or longer. Defendants limited compensable vehicle-maintenance time to 30 minutes regardless of the actual time required. For example, Valvoline oil changes required approval from Defendants' fleet company, which could take up to approximately 30 minutes before service even began, and the maintenance itself could take at least an additional 20 to 30 minutes. Defendants did not compensate J. Waters for all time

37

spent obtaining approval, waiting for service, remaining with the company vehicle, or completing required maintenance beyond the 30-minute cap.

95.     J. Waters also experienced or was subject to Defendants' policies concerning field interruptions caused by weather and other field conditions while on active deployment. When lightning, severe weather, or similar conditions interrupted work, Defendants required or instructed field technicians to stop working, remain in or near the field location or company vehicle, and wait until work could safely resume, while treating the time as non-compensable or requiring technicians to make up the time later in the week. Defendants' exclusion of such waiting time further reduced J. Waters' recorded hours and contributed to Defendants' failure to count all compensable hours when determining whether J. Waters worked more than forty hours in a workweek and the amount of overtime compensation owed.

96.     Defendants' productive-hours system and related policies discouraged J. Waters from accurately recording all compensable work time. Defendants tied compensation, productivity expectations, and incentive eligibility to productive-hours metrics, including minimum weekly productive-hour thresholds of 45 hours. Recording non-production time such as drive time, vehicle-maintenance time, weather-delay time, mandatory meeting time, or pre- and post-shift work could reduce a technician's apparent productivity or invite supervisory scrutiny. Defendants communicated these policies through managers, word of mouth, emails, text messages, and other written or electronic communications.

97.     J. Waters worked alongside approximately 10 to 15 other field employees who were subject to the same or similar productive-hours system, travel practices, vehicle rules, meeting requirements, and timekeeping practices. Based on his own experience and observations, J. Waters understood that other field employees were likewise required to perform pre-departure work, drive

38

company vehicles from lodging to remote field locations, perform post-return data work, attend mandatory meetings, maintain company vehicles, and comply with Defendants' productive-hours requirements without Defendants counting all such time as compensable hours worked for purposes of calculating overtime.

98.    As a result of Defendants' policies and practices, Defendants failed to count all compensable work J. Waters performed before, during, and after his field assignments when determining whether he worked more than forty hours in a workweek and when calculating the amount of overtime compensation owed. J. Waters brings these claims on behalf of himself and all similarly situated employees who were subject to the same or similar productive-hours system and related timekeeping practices.

### C.  **Plaintiff Jaron Reese Weimer**

99.    Weimer was employed Plaintiff Jaron Reese Weimer ("Weimer") was employed by Defendants as a GPS Field Technician 1 within DRG's Utility Access Management division from approximately December 18, 2022 through August 22, 2025. At all relevant times, Weimer was paid at an hourly rate of approximately $22 per hour, was classified by Defendants as a non-exempt employee, and was eligible for overtime compensation under the FLSA and applicable state law. During his employment, Weimer reported primarily to Colton Westover in DRG's Northeast Region. Weimer worked on remote field assignments in multiple states, including Pennsylvania, North Carolina, South Carolina, Michigan, Delaware, West Virginia, Tennessee, Maine, New York, and Ohio and was subject to Defendants' productive-hours and quota-based compensation system.

100.    Weimer's primary job duties included traveling to assigned utility field locations, performing joint-use audits, pole inspections, pole sounding, GIS data collection, and related

39

utility field work, recording field data, and submitting that data through Defendants' required systems. Defendants assigned Weimer a company vehicle, a 2021 Toyota RAV4 Hybrid, and required him to use and transport company-issued tools, data devices, equipment, and materials needed to complete his field assignments. While on remote assignments, Weimer stayed in lodging selected, arranged, approved, or directed by Defendants and began and ended many workdays from that lodging.

101. On remote deployment days, Weimer regularly performed required work before reaching the first pole or field location of the day. Weimer typically woke between approximately 5:30 a.m. and 6:00 a.m. and began performing work-related tasks at his assigned lodging. This pre-departure work included, among other tasks, checking emails, reviewing and correcting overnight quality-control issues or data flags, loading and downloading maps, planning his route, checking assignments, inspecting the company vehicle, loading tools and equipment into the vehicle, uploading or syncing prior-day data, and communicating with dispatch or his supervisor. Weimer also attended mandatory safety, OSHA, toolbox, project-update, or production meetings, including meetings held by Google Meet, that typically lasted approximately 45 minutes to one hour and occurred approximately one to two times per week. In total, Weimer's pre-departure work typically took approximately one hour per day, and downloading or loading maps could alone take approximately 25 minutes to one hour depending on the project and available connectivity. These tasks were performed at Defendants' direction and for Defendants' benefit, but Defendants did not record or compensate Weimer for all time spent performing them. Defendants instructed Weimer he was not to clock in until he arrived at the jobsite or first pole.

102. After completing required pre-departure tasks, Weimer drove from his assigned lodging to his first field location in a company vehicle carrying Defendants' tools, equipment, and

40

materials. His drive from lodging to the first field location typically took approximately 30 to 45 minutes each way, depending on the project, territory, weather, traffic, and distance between lodging and the assigned work area. On certain remote assignments, including assignments in the Carolinas, Maine, and New York, the drive could take approximately 1.5 to 2 hours each way. At the end of the field day, Weimer drove from the final field location back to his assigned lodging. Defendants generally excluded this drive time from Weimer's paid hours, even though the drives occurred after required work had begun and before required work had ended. Weimer was instructed to clock out at the last pole and was not paid for the return drive to lodging.

103. After returning to his assigned lodging, Weimer was required to perform post-shift work, including uploading photographs, syncing ArcGIS or other data platforms, completing daily reports or inspection logs, securing or inventorying tools and equipment, refueling the company vehicle, and responding to supervisor communications or quality-control feedback. Depending on the project and volume of data, uploading photographs could take approximately 1.5 to 2 hours, syncing ArcGIS or other platforms could take approximately 30 to 45 minutes, completing reports or logs could take approximately 15 minutes, securing tools and equipment could take approximately 10 minutes, refueling could take approximately 25 minutes, and responding to supervisor communications or quality-control feedback could take approximately 20 to 30 minutes. Defendants required or expected this post-return work to be performed after Weimer had clocked out and did not record or compensate him for all time spent performing it.

104. Defendants did not pay Weimer based on all hours actually worked. Instead, Defendants calculated his compensable time under their productive-hours system, which credited time based principally on the number of poles or units completed, applicable production expectations, or the time between the first and last audited field entry. As applied to Weimer, that

41

system failed to capture substantial required work performed before the first recorded field entry and after the last recorded field entry, including pre-departure work, hotel-to-jobsite drive time, post-shift data work, meetings, vehicle-related duties, and other non-production tasks. Weimer understood that, although he was nominally paid hourly, his recorded and paid hours could be reduced if he did not meet the applicable production quota. When winter storms, heavy rain, difficult terrain, or other field conditions reduced production, Weimer could work a long field day but be credited with fewer productive hours, and Defendants would require or expect him to make up the difference later in the week. Defendants' records will identify the precise production rates, credited hours, and pay calculations applicable to Weimer.

105. Weimer regularly worked more than forty hours in a workweek when all compensable time was counted, including field work, pre-departure duties, hotel-to-jobsite drive time, drive time between field locations, return drive time to lodging, post-shift data work, meetings, vehicle-related duties, and other required work. Weimer estimates that he typically worked approximately 60 to 65 actual hours per week, while Defendants typically recorded or paid approximately 50 to 55 hours per week. When Defendants paid overtime, they paid overtime based on the reduced number of hours Defendants recorded or credited, not based on all hours Weimer actually worked. For example, during the workweek of June 16 through June 20, 2025, Weimer estimates that he worked approximately 62 actual hours, including pre-departure work, hotel-to-jobsite travel, active field work, between-site travel, return travel to lodging, post-return work, mandatory meeting time, vehicle-related time, and other required work, but Defendants recorded or paid only approximately 45 hours and paid only approximately 5 overtime hours. Defendants therefore failed to pay Weimer for all hours worked and failed to pay the full overtime compensation owed for all hours worked over forty in a workweek. Defendants' payroll,

42

timekeeping, productivity, GPS, and project records will further identify the precise workweeks and amounts owed.

106. Defendants also required Weimer to maintain, refuel, clean, and otherwise care for his company-assigned 2021 Toyota RAV4 Hybrid so that it could be used for Defendants' field operations. Weimer was responsible for vehicle maintenance and service, including oil changes, tire rotations or replacements, general service visits, fueling, washing, and minor repairs. These tasks arose regularly, including monthly oil changes, daily fueling, and biweekly washing. Maintenance appointments at Toyota dealerships typically took approximately two hours from start to finish. During maintenance appointments, Weimer was effectively on call or stranded without transportation until the work was complete and was not free to use the time for his own purposes. Defendants limited compensable vehicle-maintenance time to 30 minutes regardless of the actual time required. Weimer was verbally warned on multiple occasions and threatened with write-ups or suspension when he recorded or attempted to record more than 30 minutes for vehicle maintenance. For example, on at least one occasion, Weimer was required to obtain new tires, an oil change, a coolant flush, and 80,000-mile vehicle maintenance, which took approximately 3 hours, but Defendants did not compensate him for all time spent performing or waiting for that required maintenance, given the 30-minute cap.

107. Weimer was also subject to Defendants' policies and practices concerning work interruptions caused by weather and other field conditions while on active deployment. Winter storms, heavy summer rain, lightning, and other weather conditions interfered with Weimer's ability to perform field work and meet Defendants' production expectations. When weather or similar conditions interrupted work, Defendants treated the time as non-compensable or required Weimer to make up the time later in the week, rather than counting all waiting time and interruption

time as compensable hours worked. Defendants' exclusion of such waiting time and weather-related time further reduced Weimer's recorded hours and the hours counted toward overtime, causing Defendants to understate and underpay the overtime compensation owed.

108. Defendants' productive-hours system and related policies also discouraged Weimer from accurately recording all compensable work time. Defendants tied compensation, productivity expectations, continued good standing, and incentive eligibility to productive-hours metrics, including a minimum weekly productive-hours threshold of approximately 45 hours. Weimer understood that field employees were expected to record approximately 180 productive hours in a four-week month and approximately 225 productive hours in a five-week month, and that failing to meet those expectations could result in write-ups or other discipline. Recording non-production time such as drive time, vehicle-maintenance time, weather-delay time, mandatory meeting time, or pre- and post-shift work could reduce a technician's apparent productivity or invite supervisory scrutiny. Defendants communicated these policies through coordinators, project start-up meetings, productivity guides, emails, text messages, and verbal instructions. Weimer worked alongside other field employees who were subject to the same or similar productive-hours system, travel practices, vehicle rules, meeting requirements, and timekeeping practices.

109. As a result of Defendants' policies and practices, Weimer was deprived of compensation for required work performed before, during, and after his field assignments, including overtime compensation for hours worked in excess of forty in a workweek. Weimer brings these claims on behalf of himself and all similarly situated employees who were subject to the same or similar productive-hours system and related timekeeping practices.

D. **Plaintiff Kristinn Renee Robeda Waters**

110. Plaintiff Kristinn Renee Robeda Waters ("K. Waters") was employed by

44

Defendants as a GIS Field Technician within DRG's Joint Use, MRE, Katapult, and AT&T-related operations from approximately October 2024 through March 7, 2026. At all relevant times, K. Waters was paid at an hourly rate of approximately $20 per hour, was classified by Defendants as a non-exempt employee, and was eligible for overtime compensation under the FLSA and applicable state law. During her employment, K. Waters reported to multiple supervisors and project managers, including Colton Westover, Javier Gonzales, Nicholas Bliley, Mike McMiguan, Josh Meriwether, Jimmy Hasley, Chris Vanderclip, Emily Burleson, and Lloyd Napier. K. Waters worked on remote field assignments in multiple states, including Pennsylvania, Tennessee, Ohio, New York, West Virginia, New York, Maine, Alabama, and Kentucky, and was subject to Defendants' productive-hours and quota-based compensation system.

111. K. Waters' primary job duties included traveling to assigned utility field locations, inspecting and collecting data concerning utility poles and related infrastructure, recording field data, calibrating photos, correcting quality-control issues, and submitting field data through Defendants' required systems, including DFC, Katapult, and/or other project platforms. Defendants assigned K. Waters a company vehicle and required her to use and transport company-issued tools, equipment, data devices, and materials needed to complete her field assignments. While on remote assignments, K. Waters stayed in lodging selected, arranged, approved, or directed by Defendants and began and ended many workdays from that lodging.

112. On remote deployment days, K. Waters regularly performed required work before reaching the first pole or field location of the day. This pre-departure work included, among other tasks, checking DFC or other project systems, downloading maps, reviewing quality-control issues from the prior day, correcting or attempting to correct quality-control items, planning her route, checking assignments, inspecting the company vehicle, loading tools and equipment into the

45

vehicle, uploading or syncing prior-day data, and communicating with supervisors or through project group chats. K. Waters also attended mandatory OSHA, safety, toolbox, project-update, or stand-down meetings, including weekly meetings and additional meetings called by management. Depending on the project and volume of quality-control issues, K. Waters' pre-departure work could take approximately 20 minutes to 1 hour or more per day. These tasks were performed at Defendants' direction and for Defendants' benefit, but Defendants did not record or compensate K. Waters for all time spent performing them.

113.     After completing required pre-departure tasks, K. Waters drove from her assigned lodging to her first field location in a company vehicle carrying Defendants' tools, equipment, and materials. Her drive from lodging to the first field location typically ranged from approximately 20 minutes to 1 hour, depending on the project, map location, territory, traffic, weather, and distance between lodging and the assigned work area. At the end of the field day, K. Waters drove from the final field location back to her assigned lodging, a return trip that typically took up to approximately 1 hour. Defendants generally excluded this drive time from K. Waters' paid hours, even though the drives occurred after required work had begun and before required work had ended. On the Versant Project in Maine, Defendants paid partial drive time for a limited period when the jobsite was approximately two hours away but later during the project stopped paying such drive time.

114.     After returning to her assigned lodging, K. Waters was required to perform post-shift work, including uploading photographs, syncing ArcGIS, DFC, Katapult, or other project platforms, completing or transmitting daily reports or inspection logs, securing or inventorying tools and equipment, refueling the company vehicle, and responding to supervisor communications or quality-control feedback. Depending on the project, the volume of data, and the number of

46

quality-control issues, uploading photographs, syncing data, and completing required reports could take substantial time, including up to several hours on certain projects. K. Waters also spent time refueling the company vehicle, securing equipment, and responding to supervisor communications, including daily or near-daily communications through project group chats. Defendants required or expected this post-return work to be performed after the field day but did not record or compensate K. Waters for all time spent performing it.

115.    Defendants did not pay K. Waters based on all hours actually worked. Instead, on many projects, Defendants calculated her compensable time under their productive-hours system, which credited time based principally on the number of poles or units completed, applicable production expectations, or the time between the first and last audited field entry. As applied to K. Waters, that system failed to capture substantial required work performed before the first recorded field entry and after the last recorded field entry, including pre-departure work, quality-control work, hotel-to-jobsite drive time, post-shift data work, meetings, vehicle-related duties, and other non-production tasks. K. Waters understood that drive time was generally treated as non-production time and was paid only in limited circumstances, such as when specifically approved or when traveling from one project to another. K. Waters further understood that, even when drive time or other non-production time was excluded from pay, technicians were still expected to satisfy projected productive-hour requirements. Defendants' records will identify the precise production rates, credited hours, and pay calculations applicable to K. Waters.

116.    K. Waters regularly worked more than forty hours in a workweek when all compensable time was counted, including field work, pre-departure duties, hotel-to-jobsite drive time, drive time between field locations, return drive time to lodging, post-shift data work, meetings, vehicle-related duties, and other required work. K. Waters estimates that she typically

47

worked well-over approximately 50 actual hours per week. Defendants, however, typically recorded or paid K. Waters for approximately 40 hours per week, and there were weeks in which even 40 recorded hours were difficult to obtain because of project assignments, cost-center restrictions, or excluded non-production time. When Defendants paid overtime, they paid overtime based only on the reduced number of hours Defendants recorded or credited, not based on all hours K. Waters actually worked. For example, during one or more workweeks in approximately October 2025 and January 2026, K. Waters worked well-over 40 actual hours, but Defendants recorded or paid only approximately 40 hours and failed to pay the full overtime compensation owed for all hours worked over forty. Defendants' payroll, timekeeping, productivity, GPS, and project records will further identify the precise workweeks and amounts owed.

117. Defendants also required K. Waters to maintain, refuel, clean, schedule service for, and otherwise care for her company-assigned vehicle so that it could be used for Defendants' field operations. K. Waters was responsible for ensuring that oil changes, fueling, washing, service appointments, and other maintenance were completed. Vehicle maintenance could take hours, and when a vehicle required more than routine service, it could take a day or longer. Defendants did not compensate K. Waters for all time spent obtaining approval, scheduling service, waiting for service, remaining with the company vehicle, transporting herself to or from the vehicle, or completing required maintenance. For example, while K Waters was working in Kentucky in 2025, she was permitted to record only approximately 15 minutes for vehicle maintenance even though she was forced to remain with the vehicle for over an hour, causing K. Waters to lose compensable time even though she was performing required work for Defendants' benefit.

118. K. Waters was also subject to Defendants' policies and practices concerning work interruptions caused by weather and other field conditions while on active deployment. When

48

lightning, severe weather, or similar conditions interrupted field work Defendants required or instructed K. Waters and similarly situated technicians to stop working, remain in or near the field location or company vehicle, and wait until work could safely resume. Defendants did not compensate K. Waters for all such waiting time and instead treated the time as non-compensable or required technicians to make up the time later in the week. Defendants' exclusion of such waiting time further reduced K. Waters' recorded hours and the hours counted toward overtime, causing Defendants to understate and underpay the overtime compensation owed.

119. Defendants' productive-hours system and related policies also discouraged K. Waters from accurately recording all compensable work time. Defendants tied compensation, productivity expectations, continued good standing, and overtime eligibility to productive-hours metrics and project-specific cost-center rules, including expectations that technicians reach 45 hours. K. Waters understood that, although Defendants told her she was an hourly employee, project-specific rules and productive-hour expectations controlled whether she could record all time actually worked. K. Waters also understood that non-production time, including drive time, quality-control time, meeting time, maintenance time, weather-delay time, and pre- and post-shift work, could be rejected, disallowed, or treated as time that did not count toward required weekly expectations. In or around August 2025, Josh Meriwether told K. Waters and other employees on one project that they would not be paid for certain manager-created meetings because the project was "too easy"; K. Waters and other employees were not paid for such meetings for approximately three months. K Waters recalls that multiple other employees raised concerns about unpaid meetings with Supervisors Josh Meriwether and Colton Westover. Defendants communicated these policies and instructions through managers, project group chats, text messages, phone calls, and other written or electronic communications.

120. K. Waters worked alongside other field employees who were subject to the same or similar productive-hours system, travel practices, vehicle rules, meeting requirements, and timekeeping practices. K. Waters estimates that individual projects could include up to approximately 20 employees, and that her immediate crew included approximately 7 to 8 employees who experienced similar issues with unpaid travel time, unpaid meetings, unpaid maintenance time, denied or reduced overtime, or other unpaid work, including Vinny Prattico, Antonio Austin, Chance Bailey, Mike E. [last name unknown], Khalid [last name unknown], C.G. [full name unknown], and Justinn Waters.

121. As a result of Defendants' policies and practices, K. Waters was deprived of compensation for required work performed before, during, and after her field assignments, including overtime compensation for hours worked in excess of forty in a workweek. K. Waters brings these claims on behalf of herself and all similarly situated employees who were subject to the same or similar productive-hours system and related timekeeping practices.

### E. **Plaintiff Michael Prystaloski**

122. Plaintiff Michael Philip Prystaloski ("Prystaloski") was employed by Defendants as a GIS Technician within DRG's GIS/Data Collection operations from approximately May 2023 through April 2024. At all relevant times, Prystaloski was paid at an hourly rate of approximately $20 per hour, was classified by Defendants as a non-exempt employee, and was eligible for overtime compensation under the FLSA and applicable state law. During his employment, Prystaloski reported to Javier Gonzalez and project manager Colton Westover. Prystaloski worked on remote field assignments in multiple states, including Pennsylvania, Delaware, North Carolina, and South Carolina, and was subject to Defendants' productive-hours and quota-based compensation system.

50

123. Prystaloski's primary job duties included traveling to assigned utility field locations, inspecting and/or collecting GIS and utility-pole data, recording field data, addressing quality-control issues, and submitting that data through Defendants' required systems. Defendants assigned Prystaloski a company vehicle, a Toyota Tacoma, and required him to use and transport company-issued equipment, including an iPad and tools necessary to perform the assigned field work. While on remote assignments, Prystaloski stayed in lodging selected, arranged, approved, or directed by Defendants and began and ended many workdays from that lodging.

124. On remote deployment days, Prystaloski regularly performed required work before reaching the first pole or field location of the day. Prystaloski's workday typically began at his assigned hotel at approximately 5:00 a.m., when he checked his iPad to determine whether he had quality-control issues or other assignments requiring attention. This pre-departure work included, among other tasks, reviewing overnight quality-control items or data flags, planning the day's route, checking assignments, conducting a vehicle walk-around inspection, loading tools and equipment into the company vehicle, uploading or syncing prior-day data, and communicating with his supervisor or dispatch. Prystaloski also attended mandatory safety, OSHA, toolbox, or project meetings, including weekly Tuesday morning project meetings. His pre-departure tasks typically took approximately 30 to 40 minutes per day, not including longer meeting time when meetings occurred. These tasks were performed at Defendants' direction and for Defendants' benefit, but Defendants did not record or compensate Prystaloski for all time spent performing them.

125. After completing required pre-departure tasks, Prystaloski drove from his assigned lodging to his first field location in a company vehicle carrying Defendants' tools, equipment, and data devices. His drive from lodging to the first field location typically took at least approximately

51

30 minutes, depending on the state, project location, traffic, territory, and distance between lodging and the assigned work area. During the drive, Prystaloski sometimes received work-related calls, check-ins, instructions, or messages from his supervisor, including instructions to address quality-control issues in the morning. At the end of the field day, Prystaloski drove from the final field location back to his assigned lodging, a return trip that typically took approximately 30 minutes to 1 hour. Defendants generally excluded this drive time from Prystaloski's paid hours, even though the drives occurred after required work had begun and before required work had ended.

126.    Prystaloski also performed end-of-assignment travel for Defendants' benefit. When remote assignments ended, Defendants required or expected Prystaloski to travel from the assignment location back to his home base or residence. The duration of this travel varied by project location and could be substantial. For example, travel from South Carolina to Pennsylvania took approximately 12 hours. Prystaloski typically performed this travel during the workweek, including on Friday mornings after he had completed the hours Defendants expected him to record for the week. Defendants did not compensate Prystaloski for all such return-home travel time.

127.    After returning to his assigned lodging, Prystaloski was required to perform post-shift work, including uploading photographs, syncing ArcGIS or other data platforms, securing or inventorying tools and equipment, refueling the company vehicle, and responding to supervisor communications or quality-control feedback. Uploading photographs and syncing data typically took approximately 10 minutes each and occurred daily. Securing or inventorying tools and equipment typically took approximately 10 minutes and occurred daily. Refueling the company vehicle typically took approximately 10 to 15 minutes and occurred weekly or as needed. Responding to supervisor communications or quality-control feedback could take approximately 30 to 45 minutes and occurred weekly or as needed. Defendants required or expected this post-

return work to be performed after the field day but did not record or compensate Prystaloski for all time spent performing it.

128. Defendants did not pay Prystaloski based on all hours actually worked. Although Prystaloski understood that he was paid hourly, Defendants subjected him to a pole-count and quota-based system under which he was required to meet certain daily and weekly pole-count or revenue expectations. If his pole count or revenue did not meet Defendants' expectations, he could be spoken to, disciplined, or possibly terminated. Defendants instructed Prystaloski that he was supposed to clock in at the first pole and clock out at the last pole. As applied to Prystaloski, that system failed to capture substantial required work performed before the first recorded field entry and after the last recorded field entry, including pre-departure work, hotel-to-jobsite drive time, post-shift data work, meetings, vehicle-related duties, and other non-production tasks. Defendants' records will identify the precise production rates, credited hours, and pay calculations applicable to Prystaloski.

129. Prystaloski regularly worked more than 40 hours in a workweek when all compensable time was counted, including field work, pre-departure duties, hotel-to-jobsite drive time, drive time between field locations, return drive time to lodging, post-shift data work, meetings, vehicle-related duties, and other required work. Prystaloski was required to work a minimum of approximately 45 hours per week. He often worked approximately 12 hours per day, but Defendants did not record or compensate him for all additional compensable time worked before clock-in, after clock-out, during required travel, during post-return work, or during required vehicle maintenance. Although Defendants paid Prystaloski overtime for some hours recorded over forty, they paid overtime based only on the reduced number of hours Defendants recorded or credited, not based on all hours Prystaloski actually worked. For example, on one such occasion,

53

Prystaloski estimates that he worked approximately 18 actual hours, including pre-departure tasks, hotel-to-jobsite travel, active field work, between-site travel, return travel to lodging, post-return tasks, mandatory meeting time, and other required work, but Defendants recorded or paid only approximately 12 hours. Defendants therefore failed to pay Prystaloski for all hours worked and failed to pay the full overtime compensation owed for all hours worked over forty in a workweek. Defendants' payroll, timekeeping, productivity, GPS, and project records will further identify the precise workweeks and amounts owed.

130. Defendants also required Prystaloski to maintain, refuel, clean, and otherwise care for his company-assigned Toyota Tacoma so that it could be used for Defendants' field operations. Prystaloski was responsible for vehicle maintenance and service, including oil changes, tire rotations, fueling, and minor repairs. Defendants required oil changes approximately every 5,000 miles as part of their vehicle protocol. Maintenance appointments typically took approximately 1 to 1.5 hours, depending on the work required. Defendants required Prystaloski to remain with the company vehicle during maintenance appointments and did not permit him to leave and use that time for personal purposes. Defendants limited compensable vehicle-maintenance time to 30 minutes regardless of the actual time required and instructed Prystaloski that any time beyond 30 minutes required him to clock out. For example, on one occasion, Prystaloski was required to obtain a tire rotation and oil change that was expected to take approximately two hours, but Supervisor Javier Gonzalez refused to approve compensation for more than 30 minutes. Defendants did not compensate Prystaloski for all time spent obtaining service, waiting for service, remaining with the company vehicle, or completing required maintenance beyond the 30-minute cap.

131. Prystaloski was also required to attend mandatory safety, toolbox, OSHA,

54

planning, or project meetings. These included Tuesday morning meetings with the entire project team and project manager. The meetings were held at the jobsite or remotely through company iPads, and employees were required to attend even if that meant pulling over on the side of the road or wherever they happened to be located at the time of the meeting. Defendants compensated Prystaloski for only approximately 30 minutes of meeting time and did not compensate him for all time spent attending meetings when meetings lasted longer than the amount Defendants permitted him to record.

132. Prystaloski was also subject to Defendants' policies and practices concerning work interruptions caused by weather and other field conditions while on active deployment. When lightning, severe weather, or similar conditions interrupted field work, Defendants required or instructed Prystaloski and similarly situated technicians to stop working, remain in or near the field location or company vehicle, and wait until work could safely resume. Defendants did not compensate Prystaloski for all such waiting time and instead treated the time as non-compensable or required technicians to make up the time later in the week. Defendants' exclusion of such waiting time further reduced Prystaloski's recorded hours and the hours counted toward overtime, causing Defendants to understate and underpay the overtime compensation owed.

133. Defendants' productive-hours system and related policies also discouraged Prystaloski from accurately recording all compensable work time. Defendants tied compensation, productivity expectations, continued good standing, and overtime eligibility to productive-hours metrics and project-specific pole-count expectations, including a minimum weekly productive-hours threshold of approximately 45 hours. Prystaloski understood that drive time was not included in his compensable time, except in limited circumstances when moving from one project to another. Recording non-production time such as drive time, vehicle-maintenance time, weather-

delay time, mandatory meeting time, or pre- and post-shift work could reduce a technician's apparent productivity or invite supervisory scrutiny. Defendants communicated these policies and expectations through supervisors, project managers, and field-level instructions.

134.    Prystaloski worked alongside other field employees who were subject to the same or similar productive-hours system, travel practices, vehicle rules, meeting requirements, and timekeeping practices. Prystaloski estimates that approximately five or six employees worked on each project with him and were subject to the same or similar practices. Prystaloski identified coworkers who experienced similar issues with unpaid travel time, unpaid meetings, unpaid maintenance time, denied or reduced overtime, or other unpaid work, including Vinny Prattico, Jaron Weimer, Justinn Waters and Jason [last name unknown].

135.    As a result of Defendants' policies and practices, Prystaloski was deprived of compensation for required work performed before, during, and after his field assignments, including overtime compensation for hours worked in excess of forty in a workweek. Prystaloski brings these claims on behalf of himself and all similarly situated employees who were subject to the same or similar productive-hours system and related timekeeping practices.

**CLASS AND COLLECTIVE ACTION ALLEGATIONS**

**I. FLSA Collective Action Allegations**

136.    Plaintiffs bring this action as a collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b), on behalf of themselves and all other similarly situated current and former employees of Defendants. Plaintiffs seek to represent the following proposed collective:

> All current and former field employees of Defendants including, without limitation, GPS Field Technicians, GPS Field Technicians, Coordinators, Utility Auditors, and all employees in substantially similar roles regardless of title, who performed field inspection, data collection, joint-use auditing,

56

or utility infrastructure services work and were subject to Defendants' productive hours compensation system at any time during the three years preceding the filing of this Complaint through the date of final judgment (the "FLSA Collective").

137. Plaintiffs and the members of the FLSA Collective are similarly situated within the meaning of 29 U.S.C. § 216(b). The similarly situated inquiry does not require identical job duties, identical work schedules, or identical damages among collective members. It requires only that Plaintiffs and proposed collective members share a common unlawful policy or practice that, if established, constitutes a violation of the FLSA. That standard is readily satisfied here.

138. Plaintiffs and the members of the FLSA Collective: (a) held or hold the same or substantially similar job titles and performed or perform the same core duties—field inspection, data collection, and utility pole auditing—across Defendants' active projects; (b) were and are subject to the same productive hours compensation system, under which Defendants calculate compensable time by dividing pole counts by a fixed production rate rather than recording actual hours worked; (c) were and are denied compensation for the same categories of compensable work, including mandatory pre-departure tasks performed at their assigned lodging each morning, morning and return drive time in company vehicles, post-shift data upload and reporting obligations performed at the lodging each evening, weather-delay waiting time, and vehicle maintenance time in excess of the thirty-minute cap; (d) were and are subject to the same written policies and supervisory directives governing timekeeping, production quotas, vehicle maintenance, and weather clock-outs, each of which was distributed in writing through official management channels; and (e) were and are subject to the same barrier to accurate time recording, the requirement of supervisory approval for drive time and non-production entries, that was applied to every member of the field workforce on every project.

57

139. The number of individuals employed by Defendants as field technicians and subject to the productive hours system during the three-year limitations period is, upon information and belief, well in excess of one hundred. Each Representative Plaintiff worked alongside ten to fifteen fellow field technicians on each of their respective project deployments. Defendants simultaneously operated multiple projects across more than ten states throughout the class period. The identities, contact information, and employment records of all FLSA Collective members are within Defendants' exclusive possession and will be obtained through discovery.

140. Plaintiffs are prepared and willing to serve as representative plaintiffs on behalf of the FLSA Collective. Each has executed a written consent to join this action as a party plaintiff pursuant to 29 U.S.C. § 216(b), copies of which are attached hereto. Plaintiffs will fairly and adequately represent the interests of all members of the FLSA Collective and have retained counsel experienced in the prosecution of complex FLSA collective actions. Plaintiffs intend to move for conditional certification of the FLSA Collective and court-supervised notice to potential opt-in plaintiffs at the appropriate stage of proceedings. *See* Plaintiff Consent Forms, Exhibits A-E.

**II. Rule 23 Class Action Allegations**

141. Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other members of the following proposed class under the Ohio Minimum Fair Wage Standards Act, R.C. §§ 4111.01 *et seq.* ("OMFWSA"), and, to the extent applicable, the parallel wage statutes of other states in which Defendants deployed field technicians during the class period:

> All current and former field employees of Defendants, including, without limitation, GPS Field Technicians, GPS Field Technicians, Coordinators, Utility Auditors, and all employees in substantially similar roles regardless of title, who performed field inspection, data collection, joint-use auditing, or utility infrastructure services work and were subject to Defendants' productive hours compensation system at any time during the three years

58

preceding the filing of this Complaint through the date of final judgment (the "Rule 23 Class").

## A. Numerosity — Fed. R. Civ. P. 23(a)(1)

142.    The Rule 23 Class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Upon information and belief, the Rule 23 Class encompasses well in excess of one hundred current and former field employees who were subject to Defendants' productive hours system during the class period. This estimate rests on the personal knowledge of all three Representative Plaintiffs, each of whom worked alongside ten to fifteen fellow technicians per project, and on the undisputed fact that Defendants simultaneously deployed field workforces across multiple projects in more than ten states throughout the class period. The precise number of Rule 23 Class members and their identities are ascertainable from Defendants' payroll records, timekeeping records, project personnel files, and productivity logs, all of which are within Defendants' exclusive possession and control and will be obtained through discovery.

## B. Commonality — Fed. R. Civ. P. 23(a)(2)

143.    There are questions of law and fact common to the Rule 23 Class that are capable of generating common answers in a single proceeding, answers that will resolve issues central to the litigation for every class member simultaneously. Those common questions include, without limitation:

(a) Whether Defendants' productive hours formula, which calculates compensable time by dividing pole counts by a fixed production rate rather than recording actual hours worked, violates the FLSA and applicable state wage law;

(b) Whether the mandatory pre-departure tasks that Defendants required field technicians to perform at their assigned lodging each morning, including quality-control review, vehicle inspection, equipment loading, data syncing, and attendance at mandatory

59

safety meetings, constitute principal activities of the workday that trigger the continuous workday doctrine under FLSA, 29 U.S.C. Sec. 254, and *IBP, Inc. v. Alvarez,* 546 U.S. 21 (2005).

(c) Whether the morning drive from Defendants' assigned lodging to the field, made in company vehicles, carrying company equipment, under Defendants' operational direction, constitutes compensable time within the continuous workday, not a preliminary activity excludable under the Portal-to-Portal Act, 29 U.S.C. § 254;

(d) Whether the return drive from the field to the lodging is independently compensable as travel that connects the field inspection activities to the mandatory post-shift data upload performed at the lodging, rendering the entire period between first and last principal activity compensable under the continuous workday doctrine;

(e) Whether the mandatory post-shift data upload and reporting obligations performed by field technicians at their assigned lodging upon returning from the field each evening, obligations that could not be completed in the field due to the absence of reliable internet connectivity in the remote areas where Defendants deployed their workforce, constitute principal activities of the workday for which Defendants were required to provide compensation;

(f) Whether Defendants' vehicle maintenance policy, which caps compensable maintenance time at thirty minutes and requires employees to clock out for all time in excess of that cap, including for employer-mandated approval processes that alone exhaust the cap before maintenance begins, violates the FLSA and applicable state wage law;

(g) Whether Defendants' weather clock-out directive, requiring field technicians to clock

60

out and remain off the clock during weather-related work interruptions while remaining at the worksite subject to Defendants' direction and control and unable to use the time for personal purposes, violates the FLSA's waiting time requirements under 29 C.F.R. §§ 785.15–785.16;

(h) Whether Defendants' requirement that supervisory approval be obtained before any drive time or non-productive time may be recorded constitutes a systemic barrier to accurate timekeeping that renders Defendants responsible for all unrecorded compensable time as a matter of law;

(i) Whether Defendants' Production Incentive Program and Holiday Incentive Program, by conditioning bonus eligibility on productive hours thresholds calculated exclusively under the same formula used to calculate base pay, created a structural financial disincentive to accurate time recording that constitutes evidence of the systemic and willful nature of Defendants' FLSA violations;

(j) Whether Defendants' violations of the FLSA and applicable state wage law were willful within the meaning of 29 U.S.C. § 255(a) and R.C. § 4111.14(J), entitling Plaintiffs and the Class to the three-year limitations period applicable to willful violations; and

(k) Whether, and in what amount, Defendants are liable for liquidated damages under 29 U.S.C. § 216(b) and R.C. § 4111.10.

144.    Each of these questions is susceptible to common, class-wide proof drawn exclusively from Defendants' own written policies, timekeeping records and communications. None of these questions turns on the individual circumstances of any particular class member. Each is a question about the lawfulness of Defendants' policies, and Defendants applied the same policies to every member of the proposed class.

61

**C. Typicality — Fed. R. Civ. P. 23(a)(3)**

145. The claims of the Representative Plaintiffs are typical of the claims of the Rule 23 Class. Fed. R. Civ. P. 23(a)(3). Each Representative Plaintiff performed the same core job functions as absent class members, was subject to the same productive hours compensation system, was denied compensation for the same categories of compensable work and was subject to the same barriers to accurate time recording. The claims of each Representative Plaintiff arise from the same written policies and the same course of conduct as the claims of every other class member, and any differences in project assignment, applicable production rate, or damages amount among class members do not affect the typicality of the legal theories on which all claims rest. Typicality is satisfied where, as here, each class member's claim shares the same essential characteristics as the claims of the named plaintiffs, the same unlawful conduct, the same legal theory, and the same type of injury.

146. Certain Representative Plaintiffs assert individual claims for retaliation arising from the termination of their employment in response to protected activity under the FLSA and applicable state law. Those retaliation claims are asserted individually and are pleaded separately in the Claims for Relief section of this Complaint. They do not affect the typicality of the wage claims asserted on behalf of the Rule 23 Class. The wage claims of all Representative Plaintiffs, whether currently employed or formerly employed, arise from the same productive hours policies, the same exclusion of compensable time, and the same legal theories as the wage claims of every other class member. The employment status of the Representative Plaintiffs at the time of filing does not render their claims atypical of the class.

**D. Adequacy of Representation — Fed. R. Civ. P. 23(a)(4)**

147. The Representative Plaintiffs will fairly and adequately protect the interests of the

Rule 23 Class. Fed. R. Civ. P. 23(a)(4). The interests of the Representative Plaintiffs are fully aligned with those of absent class members: each seeks compensation for the same categories of unpaid work under the same legal theories, and none has any interest that is antagonistic to or in conflict with the interests of the class. The Representative Plaintiffs have demonstrated their commitment to this litigation by providing detailed factual information through completed plaintiff questionnaires, cooperating fully with counsel, and executing consents to join as party plaintiffs.

148.    Class counsel, Craig Sanders of The Sanders Law Group, is experienced in the prosecution of complex wage and hour collective and class actions under the FLSA and applicable state wage laws, are familiar with the substantive and procedural law governing claims of this nature in the Northern District of Ohio and have the resources and commitment necessary to litigate this action through trial and, if necessary, appeal. Class counsel will zealously represent the interests of all members of the Rule 23 Class.

**E. Predominance — Fed. R. Civ. P. 23(b)(3)**

149.    Questions of law and fact common to the Rule 23 Class predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). The predominant questions in this action are whether Defendants' productive hours formula is lawful, whether the multiple categories of work it excludes constitute compensable hours under the FLSA and applicable state law, and whether Defendants' violations were willful. Each of these questions is common to every class member and will be resolved by the same evidence, Defendants' own written policies, timekeeping records, and management communications, regardless of which class member's claims are at issue in a given proceeding. Liability in this case turns on the lawfulness of a system, not on the circumstances of any individual technician.

150.    Any individualized questions that may arise, principally the calculation of each

class member's specific uncompensated hours and resulting damages, do not defeat predominance. The Sixth Circuit has consistently held that the presence of individualized damages calculations does not preclude class certification where, as here, liability is susceptible to common proof. *See e.g. Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007). Moreover, the damages owed to each class member are calculable by reference to Defendants' own records: the productive hours data maintained in Defendants' timekeeping and project management systems, the applicable production rates specified in the Calculation Guide, and the payroll records establishing the compensation actually paid. Class-wide damages are therefore susceptible to formulaic calculation consistent with class treatment.

151.    The individual retaliation claims of certain Representative Plaintiffs do not defeat predominance with respect to the class-wide wage claims. Those claims are pleaded as individual counts, require proof specific to the circumstances of the individual plaintiffs who assert them, and will be adjudicated separately from the common liability and damages questions. Their presence in this Complaint does not alter the predominance of common questions over individual questions with respect to the wage claims asserted on behalf of the Rule 23 Class.

**F. Superiority — Fed. R. Civ. P. 23(b)(3)**

152.    A class action is superior to all other available methods for the fair and efficient adjudication of the wage claims of the Rule 23 Class. Fed. R. Civ. P. 23(b)(3). The damages recoverable by most individual class members are modest in relation to the cost and burden of individual litigation, making separate actions economically impracticable for the vast majority of affected workers. For many class members, a collective and class action is the only realistic mechanism for obtaining any recovery at all. Concentrating this litigation in a single proceeding before this Court promotes consistency, conserves judicial resources, and eliminates the risk of

64

inconsistent adjudications that would result if hundreds of individual workers were required to litigate the same policy questions in separate proceedings.

153. Upon information and belief, no member of the Rule 23 Class has commenced a separate action asserting the claims set forth in this Complaint, and no pending litigation in any other court would be duplicated or rendered inconsistent by certification of the proposed class.

154. This Court is the appropriate forum for the management of this action. Defendants maintain their corporate headquarters in Kent, Ohio, within this District. The written policies challenged in this action were issued from, and the compensation decisions affecting every class member were made from, Defendants' headquarters in this District. The supervisors who issued the directives attached as exhibits to this Complaint operated within the management structure headquartered in this District, and the witnesses with personal knowledge of Defendants' compensation policies are located within or proximate to this District. This action is manageable as a class action in this forum, and Plaintiffs will file a motion for class certification in accordance with the Court's scheduling order and N.D. Ohio Local Rule 23.1.

## CAUSES OF ACTION

### COUNT I

**Failure to Pay Overtime Wages in Violation of the Fair Labor Standards Act**
**29 U.S.C. §§ 207(a)(1), 216(b)**
**On Behalf of Plaintiffs and the FLSA Collective**

155. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

156. Section 7(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires every covered employer to compensate its non-exempt employees at a rate of not less than one and one-half times their regular rate of pay for each hour worked in excess of forty in a workweek. The overtime

obligation attaches to every hour of compensable work above the forty-hour threshold, including hours for which the employer's chosen compensation methodology provides no compensation at all.

157.    Defendants violated 29 U.S.C. § 207(a)(1) in two distinct and independently actionable respects. First, Defendants failed to include in their calculation of overtime-qualifying hours the categories of compensable time excluded by the productive hours formula (pre-departure tasks, morning and return drive time, post-shift data obligations, weather-delay waiting time, and excess maintenance time) with the result that workweeks in which Plaintiffs and Collective members actually worked in excess of forty hours were recorded by Defendants as below the overtime threshold, and the overtime premium owed for those hours was never paid. Second, on workweeks in which the productive hours formula did record hours in excess of forty, Defendants calculated the overtime premium on the compressed productive hours figure, the hours recorded by the formula, rather than on the actual hours worked, thereby understating the regular rate and the premium owed and systematically underpaying the overtime that was nominally recorded. Both categories of violation occurred on a recurring, workweek-by-workweek basis for the duration of each Collective member's employment.

158.    Defendants' violations of 29 U.S.C. § 207(a)(1) were willful for the reasons set forth above, and the three-year limitations period of 29 U.S.C. § 255(a) applies to all claims in this Count.

159.    By reason of Defendants' violations of 29 U.S.C. § 207(a)(1), Plaintiffs and the members of the FLSA Collective are entitled to recover: (a) all unpaid overtime compensation, including both the overtime premium for hours excluded from the formula that placed actual hours above forty and the additional premium owed for hours nominally recorded as overtime but

66

calculated on the compressed productive hours base; (b) an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b); (c) reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b); and (d) such other and further relief as the Court deems just and proper.

## COUNT II

**Retaliation in Violation of the Fair Labor Standards Act**
**29 U.S.C. § 215(a)(3)**
**Individual Claims of Designated Plaintiffs**

160.    Section 15(a)(3) of the FLSA, 29 U.S.C. § 215(a)(3), makes it unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the FLSA, or has testified or is about to testify in any such proceeding. Protected activity under Section 15(a)(3) encompasses both formal complaints and informal assertions to an employer that employees have not been paid in accordance with the law.

161.    Plaintiffs Prattico, J. Waters and K. Waters (the "Retaliation Plaintiffs") each engaged in activity protected by 29 U.S.C. § 215(a)(3) by, among other things, seeking compensation for time worked that Defendants' productive hours formula excluded from pay, asserting to Defendants' management that their recorded hours did not reflect all compensable time worked, and, by virtue of the filing of this Complaint, instituting a proceeding under the FLSA. These activities constitute protected conduct within the meaning of 29 U.S.C. § 215(a)(3).

162.    Following each Retaliation Plaintiff's engagement in protected activity—the recording of compensable time for hours worked performing duties Defendants deemed as non-production and thus non-compensable and complaining to identified management that they were not being paid for all compensable time—Defendants took adverse employment action against that plaintiff, including but not limited to termination. A causal connection exists between each

67

Retaliation Plaintiff's protected activity and the adverse employment action taken against that plaintiff, demonstrated by the proximity in time between the protected activity and the adverse action, Defendants' awareness of each plaintiff's protected activity, and the pattern of resistance to wage claims documented throughout this Complaint.

163.    By reason of Defendants' violations of 29 U.S.C. § 215(a)(3), the Retaliation Plaintiffs are entitled to recover: (a) lost wages, salary, employment benefits, and other compensation denied or lost as a result of Defendants' unlawful retaliation; (b) reinstatement to their former positions or, in the alternative, front pay in lieu of reinstatement; (c) an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b); (d) compensatory damages for emotional distress and other non-economic harm caused by Defendants' retaliatory conduct; (e) reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b); and (f) such other and further relief as the Court deems just and proper.

## COUNT III

**Failure to Pay Overtime Wages in Violation of Ohio Minimum Fair Wage Standards Act**
**R.C. §§ 4111.03(A), 4111.10**
**On Behalf of Plaintiffs and the Rule 23 Class**

164.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

165.    R.C. § 4111.03(A) requires every covered Ohio employer to pay its non-exempt employees at a rate of not less than one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek, in the manner and methods provided in and subject to the exemptions of the FLSA. Defendants are covered employers under R.C. § 4111.03(A). At all relevant times, Plaintiffs and the members of the Rule 23 Class were non-exempt employees entitled to overtime compensation under both the FLSA and the OMFWSA.

68

166. Defendants violated R.C. § 4111.03(A) by: (a) failing to record and compensate at the overtime premium rate the categories of compensable hours excluded from the productive hours formula, with the result that actual overtime hours were neither recorded nor paid; and (b) calculating the overtime premium on the productive hours formula's compressed figure rather than on actual hours worked, thereby understating both the regular rate and the overtime premium owed in workweeks where overtime was nominally recorded. Both violations are equally actionable under the OMFWSA as under the FLSA, and the Ohio statute's incorporation of the FLSA's methods and standards confirms that the legal analysis applicable to Count II applies with equal force to this Count. See R.C. § 4111.03(A).

167. Defendants' violations of R.C. § 4111.03(A) were willful, and the three-year limitations period of R.C. § 4111.14(K) applies to all claims in this Count.

168. By reason of Defendants' violations of R.C. § 4111.03(A), Plaintiffs and the members of the Rule 23 Class are entitled to recover: (a) all unpaid overtime compensation, including both the overtime premium for hours excluded from the formula and the additional premium owed for overtime nominally recorded but calculated on the compressed productive hours base; (b) reasonable attorneys' fees and costs pursuant to R.C. § 4111.10; and (c) such other and further relief as the Court deems just and proper.

### COUNT IV

**Retaliation in Violation of the Ohio Minimum Fair Wage Standards Act**
**R.C. §§ 4111.13(B), 4111.14(J)**
**Individual Claims of Designated Plaintiffs**

169. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

170. R.C. § 4111.13(B) makes it unlawful for any employer to discharge or in any other

69

manner discriminate against any employee because the employee has made any complaint to the employer, or to the Bureau of Wage and Hour Administration, that the employee has not been paid wages in accordance with R.C. §§ 4111.01 through 4111.17, or because the employee has caused or is about to cause to be instituted any proceeding under or related to those sections, or has testified or is about to testify in any such proceeding. Ohio courts interpreting R.C. § 4111.13(B) apply federal FLSA retaliation jurisprudence to determine the elements of a retaliation claim, the scope of protected activity, and the standard of causation.

171. The Retaliation Plaintiffs identified in Count III above engaged in activity protected by R.C. § 4111.13(B) by asserting to Defendants that they were not being paid in accordance with applicable Ohio wage law, and by instituting this proceeding under the OMFWSA. Defendants' adverse employment actions taken against the Retaliation Plaintiffs, as described in Count III above, constitute unlawful discrimination under R.C. § 4111.13(B) for the same reasons set forth in that Count.

172. By reason of Defendants' violations of R.C. § 4111.13(B), the Retaliation Plaintiffs are entitled to recover: (a) lost wages and other compensation denied or lost as a result of Defendants' unlawful retaliation; (b) reinstatement or, in the alternative, front pay in lieu of reinstatement; (c) an amount set by the Court sufficient to compensate each Retaliation Plaintiff and deter future violations, which shall be not less than one hundred fifty dollars for each day that the violation continued, pursuant to R.C. § 4111.14(J); (d) reasonable attorneys' fees and costs pursuant to R.C. § 4111.10; and (e) such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, on behalf of all others similarly situated, and on behalf of the proposed FLSA Collective and the proposed Rule 23 Class, respectfully pray that this

70

Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

A.  Conditionally certify this action as a collective action pursuant to 29 U.S.C. § 216(b), define the FLSA Collective as proposed herein, appoint Plaintiffs as collective representatives, appoint Plaintiffs' counsel as collective counsel, and authorize the prompt issuance of court-supervised notice to all potential opt-in plaintiffs informing them of this action and of their right to join by filing a written consent with this Court;

B.  Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), define the Rule 23 Class as proposed herein, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

C.  Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 declaring that Defendants' productive-hours compensation formula, vehicle-maintenance pay cap, weather clock-out directive, and related timekeeping and compensation practices violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207(a), and the Ohio Minimum Fair Wage Standards Act, R.C. § 4111.03(A), by failing to count all compensable hours worked when determining whether Plaintiffs and similarly situated employees worked more than forty hours in a workweek and when calculating the overtime compensation owed;

D.  To the extent permitted by applicable federal and state law, enter appropriate injunctive and equitable relief enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them, from: (i) continuing to calculate field technicians' hours worked and overtime compensation using the productive-hours formula or any

71

substantially similar output-based methodology that excludes categories of compensable work from recorded hours and overtime calculations; (ii) conditioning the recording of compensable non-productive time on supervisory approval; (iii) requiring employees to clock out during weather-related work interruptions while remaining subject to Defendants' direction and control at or near the worksite; (iv) capping compensable vehicle-maintenance time at thirty minutes regardless of actual duration; and (v) retaliating against any employee for exercising rights protected under the FLSA or the OMFWSA;

E. Award Plaintiffs and all members of the FLSA Collective all unpaid overtime compensation owed under the FLSA, including: (i) overtime compensation at one and one-half times the regular rate for all compensable hours worked in excess of forty in a workweek that Defendants failed to record, count, or compensate; and (ii) any additional overtime premium owed for workweeks in which Defendants paid overtime based on reduced productive-hour credits or otherwise understated the number of compensable hours Plaintiffs and similarly situated employees actually worked, pursuant to 29 U.S.C. §§ 207(a)(1) and 216(b);

F. Award Plaintiffs and all members of the FLSA Collective liquidated damages in an amount equal to the unpaid overtime compensation awarded under paragraphs E above, pursuant to 29 U.S.C. § 216(b);

G. Award Plaintiffs and all members of the Rule 23 Class all unpaid overtime compensation owed under the Ohio Minimum Fair Wage Standards Act, including overtime compensation owed because Defendants failed to count compensable pre-departure work, drive time, post-shift data work, mandatory meetings, vehicle-

72

maintenance time, weather-delay waiting time, and other required work when determining whether Plaintiffs and Rule 23 Class members worked more than forty hours in a workweek and when calculating the overtime compensation owed, pursuant to R.C. §§ 4111.03(A) and 4111.10;

H. Award the Retaliation Plaintiffs all wages, salary, employment benefits, and other compensation lost as a result of Defendants' unlawful retaliation, together with interest on those amounts; reinstate each Retaliation Plaintiff to his or her former position with the same seniority, benefits, and terms of employment, or, in the alternative, award front pay in lieu of reinstatement; and award liquidated damages in an amount equal to the lost wages and compensation awarded pursuant to 29 U.S.C. §§ 215(a)(3) and 216(b);

I. Award the Retaliation Plaintiffs all wages and other compensation lost as a result of Defendants' unlawful retaliation under Ohio law; reinstate each Retaliation Plaintiff to his or her former position or, in the alternative, award front pay in lieu of reinstatement; and award an amount sufficient to compensate each Retaliation Plaintiff and deter future violations, which shall be not less than one hundred fifty dollars ($150.00) for each day that Defendants' retaliatory conduct continued, pursuant to R.C. §§ 4111.13(B) and 4111.14(J);

J. Award pre-judgment and post-judgment interest on all amounts awarded herein at the maximum rate permitted by applicable law;

K. Award Plaintiffs, the FLSA Collective, and the Rule 23 Class their reasonable attorneys' fees and litigation costs, pursuant to 29 U.S.C. § 216(b) and R.C. § 4111.10, and any other applicable fee-shifting provision;

L.  Award such other and further relief, whether legal or equitable, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable, including without limitation all wage, overtime, and retaliation claims asserted under the Fair Labor Standards Act and the Ohio Minimum Fair Wage Standards Act.

Dated: June 9, 2026
    Uniondale, New York

Respectfully submitted,

**SANDERS LAW GROUP**

By: _Craig B. Sanders_
Craig B. Sanders
Luis Munoz de la Vega*
333 Earl Ovington Boulevard, Suite 402
Uniondale, New York 11553
Tel: (516) 203-7600
Email: csanders@sanderslaw.group
Email: lvega@sanderslaw.group
File No.: 144842

***Attorneys for Plaintiffs and the Proposed Class***

*\*Pro Hac Vice Admission Anticipated*

74